# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Case No. 10-50494 |
| FAIR FINANCE COMPANY, ) | |
| ) | |
| Debtor. ) | Chapter 7 |
| ) | |
| ————————————— ) | Chief Judge Marilyn Shea-Stonum |
| ) | |
| BRIAN A. BASH, CHAPTER 7 TRUSTEE ) | |
| 3200 National City Center ) | |
| 1900 E. Ninth Street ) | |
| Cleveland, OH 44114-3485, ) | Adv. Pro. No._____ |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| DANIEL S. LAIKIN ) | **COMPLAINT** |
| 9920 Towne Road ) | |
| Carmel, IN 46032 ) | |
| ) | |
| 29149 Cliffside Drive ) | |
| Malibu, CA 90265, ) | |
| ) | |
| and ) | |
| ) | |
| DC Investments, LLC ) | |
| 111 Monument Cir., Ste. 4800 ) | |
| Indianapolis, Indiana 46204 ) | |
| ) | |
| Defendants. ) | |

Plaintiff, Brian A. Bash (the "**Trustee**"), the duly appointed Chapter 7 Trustee for Fair

Finance Company, (the "**Debtor**") in the above-captioned case, hereby files this Complaint

against Defendant Daniel S. Laikin ("**Laikin**") and DC Investments, LLC ("**DCI**").  In support

of the requested relief, the Trustee states as follows:

## PRELIMINARY STATEMENT

1.      Defendant Laikin is or has been an owner of Defendant DCI, Debtor's ultimate parent.  Defendant Laikin was a director of the Debtor from 2006 to 2009.  Laikin obtained loans from DCI, which are secured by, among other things, valuable real property located in Los Angeles County, California.  The outstanding balance of Laikin's loans from DCI is nearly $20 million.  Like many insider and related-party loans from the Debtor and its parent companies, the security interests granted in connection with the almost $20 million loan to Laikin, inexplicably, were never perfected.  Around July, 2007, while Defendant Laikin was a director of the Debtor, Laikin's obligation to DCI was assigned to the Debtor.

2.      The Trustee shortly will file a Complaint seeking to substantively consolidate the assets of Debtor's parent, Fair Holdings, Inc. ("**Fair Holdings**") and its parent, DCI, with the Debtor's estate, on grounds that the Debtor, Fair Holdings and DCI are a single, indistinguishable entity.  The Trustee nonetheless files this action, even though the Trustee intends to seek substantive consolidation, because the Trustee believes time is of the essence due to the probability that Laikin will attempt to dispose of the real property securing his obligations to the Debtor, in light of his problems with the federal government, and because the Trustee is informed that Laikin has listed the real property for sale.  The Trustee wishes to perfect and preserve the deed of trust granted by Laikin for the benefit of the Debtor's estate.  However, the Trustee has been unable to obtain the original executed deed of trust and, therefore, is unable to record them.  The Trustee believes that Laikin holds title to the property and the proceeds of the loans in constructive trust for the benefit of the Debtor.  The Trustee files this Complaint in order that the Trustee may file a lis pendens asserting and preserving the Trustee's interest in the property for the benefit of the Debtor's bankruptcy estate and creditors.

- 2 -

## PROCEDURAL BACKGROUND

3.      On February 8, 2010 (the "**Petition Date**"), creditor-investors (the "**Petitioning Creditors**") filed a petition for involuntary bankruptcy against the Debtor.

4.      On the Petition Date, the creditor-investors also filed an "Emergency Motion to Appoint Interim Trustee" (Docket No. 2) alleging that a trustee was needed to oversee the operations of the Debtor because (i) the Debtor had failed to make timely payments on its debts, including failing to redeem matured certificates and failing to pay interest on unmatured certificates; (ii) the Debtor and several affiliated companies had been raided by the Federal Bureau of Investigation in November of 2009; (iii) the Debtor has not been open to the public since the raid; and (iv) public records revealed that the Debtor had made "unusually large" loans to insiders.

5.      On February 19, 2010, this Court entered an order directing the United States Trustee to appoint an interim trustee.  Attorney Bash is the duly appointed, qualified and acting interim trustee in the within proceedings.

6.      On February 24, 2010, the Debtor filed notice that it consents to the entry of an order for relief in this proceeding (Docket No. 35).

7.      On March 2, 2010, the Court entered an Order granting the relief sought by the Petitioning Creditors *nunc pro tunc* as of February 24, 2010 (Docket No. 40).

8.      On March 2, 2010, the United States Trustee filed the Notice of Appointment of Interim Chapter 7 Trustee *nunc pro tunc* effective February 24, 2010 (Docket No. 41).  Attorney Bash is the duly appointed, qualified and acting interim Trustee in the within proceedings.

## THE PARTIES

9.      Brian A. Bash is the duly appointed chapter 7 Trustee for Fair Finance Company

- 3 -

in the above-captioned bankruptcy case.

10.     Defendant Laikin is an individual residing at 9920 Towne Road, Carmel, Indiana 46032. Defendant Laikin is or has been an owner of Defendant DCI. Defendant Laikin was a director of the Debtor from 2006 to 2009. He is currently awaiting sentencing on criminal charges related to securities fraud.

11.     Defendant DCI is an Indiana limited liability company with its address at 111 Monument Cir., Ste. 4800, Indianapolis, Indiana 46204, and its principal place of business at 815 E. Market Street, Akron, Ohio 44305. DCI owns 100% of Fair Holdings, and Fair Holdings owns 100% of the Debtor. Timothy S. Durham ("**Durham**") and James F. Cochran ("**Cochran**") each own fifty percent of DCI, Fair Holdings and the Debtor.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 7001 of the Federal Rules of Bankruptcy Procedure. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL ALLEGATIONS

13.     The Debtor is wholly owned by its parent company, Fair Holdings. Fair Holdings is wholly owned by its parent, DCI. Fair Holdings was formed solely for the purpose of purchasing all of the common shares of the Debtor. At the time of the purchase in 2002, the Debtor was a strong, viable, reputable company. By 2009, the Debtor had been utterly looted through insider loans, resulting in the shut-down of the Debtor's business after the FBI raid.

14.     Fair Holdings and DCI conducted no business other than to draw money out of the Debtor through purported "loans."

15.     The current balance due the Debtor on direct loans to Fair Holdings is at least $76 million.  The current balance due the Debtor on direct loans to DCI is at least $66 million.

16.     Fair Holdings also purportedly "loaned" the money it received from the Debtor, mainly to insiders, including its own parent, DCI.

17.     The money siphoned from the Debtor, through Fair Holdings and DCI, was then transferred out in more purported "loans" to others, again mainly insiders, affiliates and related entities, including personal loans to owners Durham and Cochran and Defendant Laikin.

18.     Durham and Cochran each are fifty percent owners of the Debtor, Fair Holdings and DCI.  Durham and Cochran are officers and directors of both the Debtor and its parent, Fair Holdings.

19.     Defendant Laikin was a director of the Debtor from 2006 to 2009.

20.     On or about August 8, 2002, Laiken executed a Secured Promissory Note in favor of DCI (as amended, the "**Note**").  A copy of the Note is attached hereto as **Exhibit A**.  As of the date hereof, the outstanding balance on the Laikin Note is nearly $20 million.  The source of the funds DCI loaned to Laikin was the Debtor.

21.     Pursuant to the Deed of Trust, dated July 30, 2004, between Laikin, as Trustor, DCI, as Beneficiary, and Gary D. Sallee, as Trustee (the "**Deed of Trust**"), the Note is secured by eight (8) parcels of real property located in Los Angeles County, California, as more fully described in the Deed of Trust, attached hereto as **Exhibit B**.

22.     Pursuant to the Pledge Agreements, dated August 1, 2002 and August 8, 2002, between Laikin and DCI (together, the "**Pledge Agreements**"), the Note is also secured by certain securities owned by Laikin and held in an account of Timothy S. Durham.  A copy of the Pledge Agreements are attached hereto as **Exhibit C**.

- 5 -

23.     On information and belief, during July, 2007, DCI assigned the Note to the Debtor, and the Note was thereafter treated and reported as a receivable owing to the Debtor.

24.     The Debtor, Fair Holdings and DCI were lax, at best, in documenting insider loans, and often failed to perfect security interests in collateral securing insider loans. DCI failed to perfect its security interests under the Laikin Note. DCI was to have recorded the security instruments and assigned the instruments and the Note to the Debtor.

25.     Upon information and belief, Defendant Laikin used his status as an insider and affiliate of Durham and Cochran to obtain funds from the Debtor, to the detriment of Debtor's creditors.

26.     Upon information and belief, Defendant Laikin's used his insider status to obtain loans of Debtor's funds on commercially unreasonable terms and without commercial formalities, such as perfecting liens Laikin's real property pledged as collateral, which enabled Laikin to encumber the property without regard to, and to the detriment of, the Debtor and its ability to recover the amounts due under the Note.

27.     The Debtor generally did not collect regular payments on loans to its parent companies, not even interest payments, and did not take any action to enforce its rights under the loan documents against insiders.

28.     For all real and practical purposes, the operations and affairs of the Debtor, Fair Holdings and DCI are so entangled that they are one and the same company. Fair Holdings and DCI essentially used the Debtor as a cash cow to personally enrich the owners and other insiders and affiliates.

29.     Fair Holdings and DCI did not conduct any business other than to receive and redistribute money from the Debtor.

- 6 -

30. DCI has no creditors other than Fair Holdings and the Debtor.

31. DCI has the same principal place of business as the Debtor, which is located at premises owned by the Debtor.

32. DCI, Fair Holdings and the Debtor share common management and administrative personnel.

33. In short, Fair Holdings and DCI have no function, and, indeed, could not have functioned, independent of the Debtor and its money.

34. The Debtor, Fair Holdings and DCI held themselves out to creditors as a single entity, and creditors have relied on that representation.

35. Fair Holdings used the funds it received from the Debtor to make loans to its parent, DCI, and to other entities owned by DCI.

36. DCI made loans to Laikin using funds obtained from the Debtor.

37. The Debtor and Fair Holdings are consolidated into the income tax filings of DCI.

38. The proceeds of the loans that DCI received from the Debtor were used to make loans to DCI and other insiders and affiliates, including Laikin.

39. DCI has no significant creditors other than Fair Holdings.

40. Loans and lines of credit made by the Debtor to its shareholder (Fair Holdings), officers and directors prior to June, 2006 were approved by directors who had a direct or indirect interest in the loans or lines of credit.

41. On October 1, 2009, the Debtor transferred certain related party loans and investments from DCI to the Debtor's balance sheet, including a $6.1 million "investment" by DCI in Fair Holdings.

42. As a result of the transfer of the $6.1 million investment by DCI to the Debtor's

balance sheet, the Debtor now appears to own an investment in its own parent and largest creditor, Fair Holdings.

43.     The action captioned McKibben, et al. v. Fair Finance Company, et al. (In re Fair Finance Company), which was removed to this Court on April 1, 2010, seeks relief on its claims against Laikin, DCI and the other defendants therein, including an order enjoining Laikin, DCI and the other defendants therein from disposing of or transferring any assets other than in the ordinary course of their businesses, or taking any other action which could impair or affect the ability to recover from the defendants.

## COUNT I – Breach of Note

44.     The allegations contained in all preceding Paragraphs are incorporated herein by reference.

45.     Laikin is indebted to the Debtor under the Note.

46.     Laikin breached the Note by failing to pay amounts owing under the Note as they came due and by encumbering the property described in the Deed of Trust with other liens.

47.     Upon information and belief, the Debtor performed all obligations required under the Note.

48.     Due to Laikin's breach of the Note, the unpaid and unconverted principal amount of the Note, together with all interest accrued under it, are due and payable immediately in cash, without further presentment, demand, protest or further notice of any kind.

49.     As a result of Laikin's breach of the Note, Debtor has been damaged in an amount to be proven at trial, but exceeding $19 million.

## COUNT II – Alter Ego / Piercing the Corporate Veil

50.     The allegations contained in all preceding Paragraphs are incorporated herein by

reference.

51.     Defendant DCI is liable to the Debtor's estate as a consequence of its status as the alter ego of the Debtor at the time the Debtor became liable to its creditors.

52.     At all relevant times, DCI was the sole owner of Debtor and controlled the Debtor.

53.     DCI shared common finances with the Debtor, exercised control and authority over the Debtor and treated Debtor's assets and accounts as its assets and accounts.

54.     The operations and affairs of Fair Holdings and DCI are excessively entangled with the Debtor's operations affairs such that consolidation will benefit all creditors.

55.     The assets and liabilities of Fair Holdings and DCI effectively cannot be segregated from the assets and liabilities of the Debtor.

56.     The Debtor, Fair Holdings and DCI are interdependent.

57.     Financial results for Fair Holdings and DCI are consolidated with the Debtor's financial results for offering and tax purposes.

58.     There is a unity of interests and ownership between Fair Holdings, DCI and the Debtor.

59.     Assets were transferred between Fair Holdings, DCI and the Debtor without the observance of corporate formalities.

60.     Fair Holdings, DCI and the Debtor share common management, overhead and expenses.

61.     Fair Holdings, DCI and the Debtor mutually disregarded their legal separateness.

62.     Fair Holdings, DCI and the Debtor held themselves out to creditors as a single entity, and creditors treated and engaged in business with the Debtor, Fair Holdings and DCI as

- 9 -

an indistinguishable legal entity.

63.    Creditors and investors relied on the income and assets of Fair Holdings and DCI in entering into transactions with the Debtor

64.    DCI directed the business activities of the Debtor at all times relevant to this Complaint by and among other things, negotiating contracts on the Debtor's behalf, incurring debts and other liabilities on the Debtor's behalf, exercising dominion and control over collections on accounts receivable of the Debtor, and transferring assets of the Debtor to itself, other insiders, affiliates and related entities without adequate consideration to the Debtor in return.

65.    DCI so completely dominated and controlled Debtor that Debtor had no mind, will or existence of its own.

66.    DCI may be considered the alter ego of the Debtor.

67.    At all times relevant to this complaint there was an identity of ownership, control and beneficial interest between Defendant DCI and the Debtor.

68.    Under these circumstances, recognition of and adherence to the normal attributes of separate corporate existence by the owner of the Debtor corporation would sanction DCI's inequitable conduct and promote injustice by allowing DCI to retain the benefit of monies received, facilitated by a pattern of deceitful conduct undertaken by the owner of Debtor, in order to escape payment of a legitimate debt owed to creditors.

69.    In addition, adherence to the normal attributes of separate corporate existence would undermine and subvert the public policies upon which protection from shareholder liability is based, and which proscribe unfair, deceitful, and fraudulent conduct.

70.    Moreover, DCI may be considered the alter ego of Fair Holdings.

71.     At all times relevant to this Complaint there was an identity of ownership, control, and beneficial interest between Defendant DCI, the Debtor, Fair Holdings, Durham and Cochran.

72.     Accordingly, DCI may be treated as a mere alter egos of the Debtor and, for that reason, the corporate forms may be disregarded and liability imposed on DCI in an amount to be proven at trial in this matter.

73.     The Debtor is indistinguishable from DCI for all purposes, including the Laikin Note and related security agreements and, therefore, the Trustee is entitled to enforce the Laikin loan and security agreements and proceed against the collateral securing the Laikin Note, including the real property identified in the Deed of Trust attached hereto as Exhibit B.

## COUNT III – Constructive Trust

74.     The allegations contained in all preceding Paragraphs are incorporated herein by reference.

75.     Defendants wrongfully, deceitfully and fraudulently diverted and used Debtor's funds for their own benefit.

76.     Defendant DCI has wrongfully received no less than $66 million from the Debtor.

77.     Defendant Laikin has wrongfully received no less than $19 million from the Debtor.

78.     The Note, Deed of Trust and Pledge Agreements were to have been assigned by DCI to the Debtor.

79.     Defendant Laikin holds the real property described in the Deed of Trust and pledged as collateral for the Note as a constructive trustee for Debtor's benefit; therefore, Debtor is entitled to a constructive trust regarding same.

80.     Defendant Laikin holds the proceeds of the Note as a constructive trustee for

- 11 -

Debtor's benefit; therefore, Debtor is entitled to a constructive trust regarding same.

WHEREFORE, the Trustee respectfully requests the entry of an order:

(a)  granting the Debtor all the rights of DCI, as its alter ego, under the Laikin Note, Deed of Trust and Pledge Agreements, and authorizing the Trustee to enforce same and to proceed against the collateral securing the Laikin Note, including the real property identified in the Deed of Trust attached hereto as Exhibit B;

(b)  granting the Trustee judgment on the Note in an amount to be proven at trial, but no less than $19 million;

(c)  imposing a constructive trust in favor of the Debtor on the Note, Deed of Trust and Pledge Agreements for the benefit of Debtor's estate;

(d)  imposing a constructive trust in favor of the Debtor on the real property which secures the Note, as described in the Deed of Trust attached as Exhibit B, for the benefit of the Debtor's estate;

(e)  and granting such other and further relief as is appropriate under the circumstances.

Date:  April 9, 2010                                    Respectfully submitted,

                                                       */s/ Kelly S. Burgan*
                                                       _____
                                                       Brian A. Bash, Trustee (0000134)
                                                       Kelly S. Burgan (0073649)
                                                       Joseph M. Esmont (0084322)
                                                       BAKER & HOSTETLER LLP
                                                       3200 National City Center
                                                       1900 East Ninth Street
                                                       Cleveland, Ohio 44114-3485
                                                       Telephone: 216.621.0200
                                                       Facsimile:  216.696.0740

                                                       *Counsel for the Trustee*

- 12 -

# EXHIBIT A

## SECURED PROMISSORY NOTE (Line of Credit)

$2,000,000.00
Indianapolis, Indiana
Dated: August 8, 2002
Final Maturity Date: September 1, 2003

On or before September 1, 2003 ("Final Maturity"), DANIEL LAIKIN, an Indiana resident (the "Maker") promises to pay to the order of DC INVESTMENTS, LLC, an Indiana limited liability company, (the "Lender") at his principal office at 815 E. Main Street, Akron, Ohio, the principal sum of TWO MILLION AND NO/100 DOLLARS ($2,000,000.00) or so much of the principal amount of the Loan represented by this Note as may be disbursed by the Lender under the terms described below, and to pay interest on the unpaid principal balance outstanding from time to time as provided herein.

Maker's obligations incurred under this Note shall be supported and secured by a pledge of certain publicly traded securities owned by Maker pursuant to a certain Pledge Agreement (the "Pledge Agreement") executed by Maker on behalf of Lender of even date herewith and attached hereto as Exhibit "A" and incorporated by reference herein. Maker hereby warrants and represents to Maker that none of the securities subject to the Pledge Agreement are subject to any mortgage, pledge, title retention lien, or other lien, encumbrance or security interest.

This Note evidences indebtedness (the "Loan") incurred or to be incurred by the Maker under a revolving line of credit extended to the Maker by the Lender as provided herein. The proceeds of the Loan may be advanced, repaid and re-advanced until Final Maturity. The principal amount of the Loan outstanding from time to time shall be determined by reference to the books and records of the Lender and all payments by the Maker on account of the Loan shall be recorded. Such books and records shall be deemed prima facie to be correct as to such matters. From this date and until the Final Maturity, Lender agrees to make advances from time to time to the Maker of amounts not exceeding in the aggregate at any time outstanding the lesser of the Borrowing Base or Two Million and no/100 Dollars ($2,000,000.00), provided that all of the conditions of lending stated herein have been fulfilled at the time of each advance and no default exists, provided further, that if the Borrowing Base falls below the then outstanding principal balance of the Loan, Maker shall immediately repay the amount in which the balance of the Loan exceeds the Borrowing Base.

As used herein, the term "Borrowing Base" means an amount equal to seventy percent (70%) of the fair market value of the Pledged Securities, as that term is defined in the Pledge Agreement.

Each of the following shall constitute an Event of Default under this Note:

(a)   Nonpayment of Loan: Default in the payment when due of any amount payable under the terms of this Note, or otherwise payable to the Lender or any holder of this Note under the terms of this Note;

(b)   Breach of the Pledge Agreement: Any breach or default under the Pledge Agreement; and

(c)   Bankruptcy, Insolvency, etc.: Maker admitting in writing the inability to pay his debts as they mature or an administrative or judicial order or determination of insolvency being entered against Maker; or Maker making a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee or receiver being appointed for Maker or a substantial part of his property and not being discharged within 60 days; or any bankruptcy, reorganization, debt arrangement, or other proceeding under the bankruptcy or insolvency law, or any dissolution or liquidation proceeding being instituted by or against Maker.

Interest on the unpaid principal balance of the Loan outstanding from time to time prior to Final

Maturity will accrue at a per annum rate equal to 1% above the interest rate then being paid by Fair Finance Company, an Ohio corporation on its V-6 security deposits, with such rate to change contemporaneously with each change in such established and quoted rate. Prior to maturity, accrued interest shall be due and payable on the first day of each month with interest commencing on the date of this Note and continuing each month hereafter until Final Maturity. Interest will be calculated on the basis that an entire year's interest is earned in 360 days.

Upon an Event of Default, including failure to pay upon Final Maturity, Lender at his option may also, if permitted under applicable law, do one or both of the following: (a) increase the applicable interest rate on this Note two percent (2%) and (b) add any unpaid accrued interest to the principal and such sum will bear interest thereon until paid at the rate provided in this Note. The interest rate will not exceed the maximum rate permitted by applicable law.

The entire outstanding principal balance of this Note shall be due and payable, together with accrued interest, at Final Maturity. Principal may be prepaid at anytime without penalty.

If any installment of interest due under the terms of this Note is not paid when due, then the Lender or any subsequent holder of this Note may, at its option and without notice, declare the entire principal amount of the Note and all accrued interest immediately due and payable.

If payment is 10 days or more late, Maker will be charged 5% of the regularly scheduled payment. Each late payment fee assessed shall be due and payable on the earlier of the next regularly scheduled interest payment date or the maturity of this Note. Waiver by the Lender of any late payment fee assessed, or the failure of the Lender in any instance to assess a late payment fee shall not be construed as a waiver by the Lender of its right to assess late payment fees thereafter.

Unless otherwise agreed to, in writing, or otherwise required by applicable law, payments will be applied first to accrued, unpaid interest, then to principal, and any remaining amount to any unpaid collection costs including attorneys fees, late charges and other charges, provided, however, upon delinquency or other default, Lender reserves the right to apply payment among principal, interest, late charges, collection costs and other charges at its discretion. All prepayments shall be applied to the indebtedness owing hereunder in such order and manner as Lender may from time to time determine in his sole discretion.

The Maker and any endorsers severally waive demand, presentment for payment and notice of nonpayment of this Note, and each of them consents to any renewals or extensions of the time of payment of this Note without notice.

All amounts payable under the terms of this Note shall be payable with expenses of collection, including attorneys' fees, and without relief from valuation and appraisement laws.

This Note is made under and will be governed in all cases by the substantive laws of the State of Indiana notwithstanding the fact that Indiana conflicts of law rules might otherwise require the substantive rules of law of another jurisdiction to apply.

THE MAKER AND LENDER (BY ACCEPTANCE OF THIS NOTE) HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTCIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON A CONTRACT, TORT OR OTHERWISE) BETWEEN MAKER AND LENDER ARISING OUT OF OR ANY WAY RELATED TO THIS NOTE OR ANY RRELATIONSHIP BETWEEN LENDER AND MAKER. THIS PROVISION IS A MATERIAL INDUCMENT TO LENDER TO PROVIDE THE FINANCING DESCRIBED HEREIN.

**Daniel Laikin**

## FIRST AMENDED SECURED PROMISSORY NOTE (Line of Credit)
**This First Amended Note amends and replaces a certain Secured Promissory Note dated August 8, 2002.**

> **$4,000,000.00**
> **Indianapolis, Indiana**
> **Dated: August 31, 2003**
> **Final Maturity Date: August 31, 2004**

On or before August 31, 2004 ("Final Maturity"), DANIEL LAIKIN, an Indiana resident (the "Maker") promises to pay to the order of DC INVESTMENTS, LLC, an Indiana limited liability company, (the "Lender") at its principal office at 111 Monument Circle, Suite 4800, Indianapolis, Indiana, the principal sum of FOUR MILLION AND NO//100 DOLLARS ($4,000,000.00) or so much of the principal amount of the Loan represented by this Note as may be disbursed by the Lender under the terms described below, and to pay interest on the unpaid principal balance outstanding from time to time as provided herein.

Maker's obligations incurred under this Note shall be supported and secured by a pledge of certain publicly traded securities owned by Maker pursuant to a certain Pledge Agreement (the "Pledge Agreement") executed by Maker on behalf of Lender dated August 8, 2002 and attached hereto as Exhibit "A" and incorporated by reference herein. Maker hereby warrants and represents to Maker that none of the securities subject to the Pledge Agreement are subject to any mortgage, pledge, title retention lien, or other lien, encumbrance, or security interest. All of the shares of stock subject to the Pledge Agreement have been transferred to the custody and control of Lender and are subject to a Stock Power executed by Borrower and have been transferred with the intention of Borrower to create a security interest therein.

This Note evidences indebtedness (the "Loan") incurred or to be incurred by the Maker under a revolving line of credit extended to the Maker by the Lender as provided herein. The proceeds of the Loan may be advanced, repaid and re-advanced until Final Maturity. The principal amount of the Loan outstanding from time to time shall be determined by reference to the books and records of the Lender and all payments by the Maker on account of the Loan shall be recorded. Such books and records shall be deemed prima facia to be correct as to such matters. From this date and until the Final Maturity, Lender agrees to make advances from time to time to the Maker of amounts not exceeding in the aggregate at any time outstanding the lesser of the Borrowing Base or Four Million and no/100 Dollars ($4,000,000.00), provided that all of the conditions of lending stated herein have been fulfilled at the time of each advance and no default exists, provided further, that if the value of the securities pledged to secure the Loan falls below seventy percent (70%) of the then outstanding principal balance of the Loan, Maker shall immediately repay that portion of the Loan

necessary to bring the Loan back into compliance without notice or demand.

As used herein, the term "Borrowing Base" means an amount equal to seventy percent (70%) of the fair market value of the Pledged Securities, as that term is defined in the Pledge Agreement.

Each of the following shall constitute an Event of Default under this Note:

(a)     Nonpayment of Loan: Default in the payment when due of any amount payable under the terms of this Note, or otherwise payable to the Lender or any holder of this Note under the terms of this Note;

(b)     Breach of the Pledge Agreement: Any breach or default under the Pledge Agreement; and

(c)     Bankruptcy, Insolvency, etc.: Maker admitting in writing the inability to pay his debts as they mature or an administrative or judicial order or determination of insolvency being entered against Maker; or Maker making a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee or receiver being appointed for Maker or a substantial part of his property and not being discharged within 60 days; or any bankruptcy, reorganization, debt arrangement, or other proceeding under the bankruptcy or insolvency law, or any dissolution or liquidation proceeding being instituted by or against Maker.

Interest on the unpaid principal balance of the Loan outstanding from time to time prior to Final Maturity will accrue at a per annum rate equal to 1% above the interest rate then being paid by Fair Finance Company, an Ohio corporation on its V-^ security deposits, with such rate to change contemporaneously with each change in such established and quoted rate. Prior to maturity, accrued interest shall be due and payable on the first day of each month with interest commencing on the date of this Note and continuing each month thereafter until Final Maturity. Interest will be calculated on the basis that an entire year's interest is earned in 360 days.

Upon an Event of Default, including failure to pay upon Final Maturity, Lender at his option may also, if permitted under applicable law, do one or both of the following: (a) increase the applicable interest rate on this Note two percent (2%) and (b) add any unpaid accrued interest to the principal and such sum will bear interest thereon until paid at the rate provided in this Note. The interest rate will not exceed the maximum rate permitted by applicable law.

The entire outstanding principal balance of this Note shall be due and payable, together with accrued interest, at Final Maturity. Principal may be prepaid at anytime

without penalty.

If any installment of interest due under the terms of this Note is not paid when due, then the Lender or any subsequent holder of this Note may, at its option and without notice, declare the entire principal amount of the Note and all accrued interest immediately due and payable.

If payment is 10 days or more late, Maker will be charged 5% of the regularly scheduled payment. Each late payment fee assessed shall be due and payable on the earlier of the next regularly scheduled interest payment date or the maturity of this Note. Waiver by the Lender of any late payment fee assessed, or the failure of the Lender in any instance to assess a late payment fee shall not be construed as a waiver by the Lender of its right to assess late payment fees thereafter.

Unless otherwise agreed to, in writing, or otherwise required by applicable law, payments will be applied first to accrued, unpaid interest, then to principal, and any remaining amount to any unpaid collection costs, late charges and other charges, provided, however, upon delinquency or other default, Lender reserves the right to apply payment among principal, interest, late charges, collection costs and other charges at its discretion. All prepayments shall be applied to the indebtedness owing hereunder in such order and manner as Lender may from time to time determine in his sole discretion.

The Maker and any endorsers severally waive demand, presentment for payment and notice of nonpayment of this Note, and each of them consents to any renewals or extensions of the time of payment of this Note without notice.

All amounts payable under the terms of this Note shall be payable with expenses of collection, including attorneys' fees, and without relief from valuation and appraisement laws.

This Note is made under and will be governed in all cases by the substantive laws of the State of Indiana notwithstanding the fact that Indiana conflicts of law rules might otherwise require the substantive rules of law of another jurisdiction to apply.

THE MAKER AND LENDER (BY ACCEPTANCE OF THIS NOTE) HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTCIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON A CONTRACT, TORT OR OTHERWISE) BETWEEN MAKER AND LENDER ARISING OUT OF OR ANY WAY RELATED TO THIS NOTE OR ANY RRELATIONSHIP BETWEEN LENDER AND MAKER. THIS PROVISION IS A MATERIAL

INDUCMENT TO LENDER TO PROVIDE THE FINANCING DESCRIBED
HEREIN.


DANIEL LAIKIN                                 DC INVESTMENTS, LLC

                                             Timothy S. Durham,
                                             Managing Member

### SECOND AMENDED SECURED PROMISSORY NOTE (Line of Credit)
**This Second Amended Note amends and replaces a certain Secured Promissory Note dated August 8, 2002 and a First Amended Secured Promissory Note dated August 31, 2003.**

$7,000,000.00
Indianapolis, Indiana
Dated: July 1, 2003
Final Maturity Date: August 31, 2005

On or before August 31, 2005 ("Final Maturity"), DANIEL LAIKIN, an Indiana resident (the "Maker") promises to pay to the order of DC INVESTMENTS, LLC, an Indiana limited liability company, (the "Lender") at its principal office at 111 Monument Circle, Suite 4800, Indianapolis, Indiana, the principal sum of SEVEN MILLION AND NO/100 DOLLARS ($7,000,000.00) or so much of the principal amount of the Loan represented by this Note as may be disbursed by the Lender under the terms described below, and to pay interest on the unpaid principal balance outstanding from time to time as provided herein.

Maker's obligations incurred under this Note shall be supported and secured by a pledge of certain publicly traded securities owned by Maker pursuant to a certain Pledge Agreement (the "Pledge Agreement") executed by Maker on behalf of Lender dated August 8, 2002 and attached hereto as Exhibit "A" and incorporated by reference herein and a mortgage on certain real property owned by Maker in California. Maker hereby warrants and represents to Maker that none of the securities subject to the Pledge Agreement are subject to any mortgage, pledge, title retention lien, or other lien, encumbrance or security interest. All of the shares of stock subject to the Pledge Agreement have been transferred to the custody and control of Lender and are subject to a Stock Power executed by Borrower and have been transferred with the intention of Borrower to create a security interest therein.

This Note evidences indebtedness (the "Loan") incurred or to be incurred by the Maker under a revolving line of credit extended to the Maker by the Lender as provided herein. The proceeds of the Loan may be advanced, repaid and re-advanced until Final Maturity. The principal amount of the Loan outstanding from time to time shall be determined by reference to the books and records of the Lender and all payments by the Maker on account of the Loan shall be recorded. Such books and records shall be deemed prima facia to be correct as to such matters. From this date and until the Final Maturity, Lender agrees to make advances from time to time to the Maker of amounts not exceeding in the aggregate at any time outstanding Seven Million and no/100 Dollars ($7,000,000.00), provided that all of the conditions of lending stated herein have been fulfilled at the time of each advance and no default exists.

1

Each of the following shall constitute an Event of Default under this Note:

(a)     Nonpayment of Loan: Default in the payment when due of any amount payable under the terms of this Note, or otherwise payable to the Lender or any holder of this Note under the terms of this Note;

(b)     Breach of the Pledge Agreement or Mortgage: Any breach or default under the Pledge Agreement or Mortgage; and

(c)     Bankruptcy, Insolvency, etc.: Maker admitting in writing the inability to pay his debts as they mature or an administrative or judicial order or determination of insolvency being entered against Maker; or Maker making a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee or receiver being appointed for Maker or a substantial part of his property and not being discharged within 60 days; or any bankruptcy, reorganization, debt arrangement, or other proceeding under the bankruptcy or insolvency law, or any dissolution or liquidation proceeding being instituted by or against Maker.

Interest on the unpaid principal balance of the Loan outstanding from time to time prior to Final Maturity will accrue at a per annum rate equal to 1% above the interest rate then being paid by Fair Finance Company, an Ohio corporation on its V-6 security deposits, with such rate to change contemporaneously with each change in such established and quoted rate. Prior to maturity, accrued interest shall accrue and shall be payable on Final Maturity. Interest will be calculated on the basis that an entire year's interest is earned in 360 days.

Upon an Event of Default, including failure to pay upon Final Maturity, Lender at his option may also, if permitted under applicable law, do one or both of the following: (a) increase the applicable interest rate on this Note two percent (2%) and (b) add any unpaid accrued interest to the principal and such sum will bear interest thereon until paid at the rate provided in this Note. The interest rate will not exceed the maximum rate permitted by applicable law.

The entire outstanding principal balance of this Note shall be due and payable, together with accrued interest, at Final Maturity. Principal may be prepaid at anytime without penalty.

If any installment of interest due under the terms of this Note is not paid when due, then the Lender or any subsequent holder of this Note may, at its option and without notice, declare the entire principal amount of the Note and all accrued interest immediately due and payable.

If payment is 10 days or more late, Maker will be charged 5% of the regularly

2

scheduled payment. Each late payment fee assessed shall be due and payable on the earlier of the next regularly scheduled interest payment date or the maturity of this Note. Waiver by the Lender of any late payment fee assessed, or the failure of the Lender in any instance to assess a late payment fee shall not be construed as a waiver by the Lender of its right to assess late payment fees thereafter.

Unless otherwise agreed to, in writing, or otherwise required by applicable law, payments will be applied first to accrued, unpaid interest, then to principal, and any remaining amount to any unpaid collection costs, late charges and other charges, provided, however, upon delinquency or other default, Lender reserves the right to apply payment among principal, interest, late charges, collection costs and other charges at its discretion. All prepayments shall be applied to the indebtedness owing hereunder in such order and manner as Lender may from time to time determine in his sole discretion.

The Maker and any endorsers severally waive demand, presentment for payment and notice of nonpayment of this Note, and each of them consents to any renewals or extensions of the time of payment of this Note without notice.

All amounts payable under the terms of this Note shall be payable with expenses of collection, including attorneys' fees, and without relief from valuation and appraisement laws.

This Note is made under and will be governed in all cases by the substantive laws of the State of Indiana notwithstanding the fact that Indiana conflicts of law rules might otherwise require the substantive rules of law of another jurisdiction to apply.

THE MAKER AND LENDER (BY ACCEPTANCE OF THIS NOTE) HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON A CONTRACT, TORT OR OTHERWISE) BETWEEN MAKER AND LENDER ARISING OUT OF OR ANY WAY RELATED TO THIS NOTE OR ANY RRELATIONSHIP BETWEEN LENDER AND MAKER. THIS PROVISION IS A MATERIAL INDUCMENT TO LENDER TO PROVIDE THE FINANCING DESCRIBED HEREIN.

DANIEL LAIKIN


DC INVESTMENTS, LLC


Timothy S. Durham,
Managing Member

3

## Third Amendment to Secured Promissory Note

**THIS THIRD AMENDMENT TO PROMISSORY NOTE** dated this 1ˢᵗ day of December 2004, is by and among Daniel Laikin, an Indiana resident ("Borrower") and DC Investments, LLC ("DCI"), an Indiana limited liability company. The parties agree as follows:

### Recitals

**WHEREAS,** Borrower and DCI entered into that certain Secured Promissory Note dated August 8, 2002 which was amended and replaced with that certain First Amended Secured Promissory Note dated August 31, 2003 and that certain Second Amended Secured Promissory Note dated July 1, 2003 (collectively "Note");

**WHEREAS,** DCI has agreed amend the Note in order to extend the Final Maturity to August 31, 2008;

**WHEREAS,** DCI is willing to amend the Note subject to the terms herein and subject to the amendment of the Note as herein provided;

**NOW THEREFORE,** in consideration of the premises, and the mutual promises herein contained, the parties agree that the Note shall be, and hereby is, amended as provided herein and the parties further agree as follows:

1. **Extended Maturity Date:** The current Maturity Date of August 31, 2005 is hereby extended and modified to be August 31, 2008.

All other terms and conditions contained in the Note, the Pledge Agreement, Mortgage, Personal Guaranty or other related documents shall remain the same and shall continue in full force and effect that are not specifically amended herein and shall continue during the amended term of the Note without change.

**IN WITNESS WHEREOF,** Borrower, and DCI have caused this Third Amendment to Secured Promissory Note to be executed personally and by its duly authorized by their representatives as of the day first written above.

DC Investments, LLC

By: _____
Timothy S. Durham, Chief Executive Officer

Daniel Laikin

_____

1

### Third Amendment to Secured Promissory Note

**THIS THIRD AMENDMENT TO PROMISSORY NOTE** dated this 1ˢᵗ day of December 2004, is by and among Daniel Laikin, an Indiana resident ("Borrower") and DC Investments, LLC ("DCI"), an Indiana limited liability company. The parties agree as follows:

### Recitals

**WHEREAS**, Borrower and DCI entered into that certain Secured Promissory Note dated August 8, 2002 which was amended and replaced with that certain First Amended Secured Promissory Note dated August 31, 2003 and that certain Second Amended Secured Promissory Note dated July 1, 2003 (collectively "Note");

**WHEREAS**, DCI has agreed amend the Note in order to extend the Final Maturity to August 31, 2008;

**WHEREAS**, DCI is willing to amend the Note subject to the terms herein and subject to the amendment of the Note as herein provided;

**NOW THEREFORE**, in consideration of the premises, and the mutual promises herein contained, the parties agree that the Note shall be, and hereby is, amended as provided herein and the parties further agree as follows:

1. **Extended Maturity Date:** The current Maturity Date of August 31, 2005 is hereby extended and modified to be August 31, 2008.

All other terms and conditions contained in the Note, the Pledge Agreement, Mortgage, Personal Guaranty or other related documents shall remain the same and shall continue in full force and effect that are not specifically amended herein and shall continue during the amended term of the Note without change.

**IN WITNESS WHEREOF**, Borrower, and DCI have caused this Third Amendment to Secured Promissory Note to be executed personally and by its duly authorized by their representatives as of the day first written above.

DC Investments, LLC.

By: _____
Timothy S. Durham, Chief Executive Officer

Daniel Laikin

_____

1

**Fourth ~~Third~~ Amendment to Secured Promissory Note**

THIS **FOURTH AMENDMENT TO PROMISSORY NOTE** dated this 1st day of July 2005, is by and among Daniel Laikin, an Indiana resident ("Borrower") and DC Investments, LLC ("DCI"), an Indiana limited liability company. The parties agree as follows:

**Recitals**

**WHEREAS**, Borrower and DCI entered into that certain Secured Promissory Note dated August 8, 2002 which was amended and replaced with that certain First Amended Secured Promissory Note dated August 31, 2003 and that certain Second Amended Secured Promissory Note dated July 1, 2003 and Third Amendment dated December 1, 2004 (collectively "Note");

**WHEREAS**, DCI has agreed amend the Note in order to increase the amount that Borrower may borrow from Seven Million Dollars to Nine Million Dollars;

**WHEREAS**, DCI is willing to amend the Note subject to the terms herein and subject to the amendment of the Note as herein provided;

**NOW THEREFORE**, in consideration of the premises, and the mutual promises herein contained, the parties agree that the Note shall be, and hereby is, amended as provided herein and the parties further agree as follows:

1. **Increase in Credit Limit::** The amount that Borrower may borrow under the Note is hereby increased from Seven Million Dollars ($7,000,000) to Nine Million Dollars ($9,000,000).

All other terms and conditions contained in the Note, the Pledge Agreement, Mortgage, Personal Guaranty or other related documents shall remain the same and shall continue in full force and effect that are not specifically amended herein and shall continue during the amended term of the Note without change.

**IN WITNESS WHEREOF**, Borrower, and DCI have caused this Fourth Amendment to Secured Promissory Note to be executed personally and by its duly authorized by their representatives as of the day first written above.

DC Investments, LLC

By: _____
Timothy S. Durham, Chief Executive Officer

Daniel Laikin

_____

1

10-50494-pmc   Doc 101   FILED 04/09/10   ENTERED 04/09/10 17:08:40   Page 25 of 85

## Four**th** Amendment to Promissory Note

**THIS FOURTH AMENDMENT TO PROMISSORY NOTE** dated this 1st day of December, 2004, is by and between Daniel Laikin ("Borrower") and DC Investments, LLC, an Indiana Limited Liability Company ("DCI"). The parties agree as follows:

### Recitals

**WHEREAS**, Borrower and DCI entered into that certain Secured Promissory Note dated August 8, 2002, which was amended and replaced with that certain First Amended Secured Promissory Note dated August 31, 2003 and that certain Second Amended Secured Promissory Note dated July 1, 2004, and the Third Amendment to Secured Promissory Note dated December 1, 2004 (the original note as amended being hereinafter referred to as the "Note")

**WHEREAS**, DCI has agreed to amend the Note in order to increase the amount which Borrower may borrow under the Note to $15,000,000.00;

**WHEREAS**, DCI is willing to amend the Note subject to the terms herein and subject to the amendment of the Note as herein provided;

**NOW THEREFORE**, in consideration of the premises, and the mutual promises herein contained, the parties agree that the Note shall be, and hereby is, amended as provided herein and the parties further agree as follows:

The principal amount of the Note is hereby increased so that the total amount that can be borrowed under the Note is $15,000,000.00.

All other terms and conditions contained in the Note, the Security Agreement and Mortgage or other related documents shall remain the same and shall continue in full force and effect that are not specifically amended herein and shall continue during the term of the Note without change, except to reflect the increase in the amount of the Note and to provide security therefore for the entire amount that may become due under the Note.

**IN WITNESS WHEREOF**, Borrower, and DCI have caused this Fourth amendment to Secured Promissory Note to be executed as of the day first written above.

DC Investments, LLC.

Daniel Laikin

By: _____
     Timothy S. Durham

Fifth

## ~~Fourth~~ Amendment to Promissory Note

**THIS FOURTH AMENDMENT TO PROMISSORY NOTE** dated this 1ˢᵗ day of December, 2005, is by and between Daniel Laikin ("Borrower") and DC Investments, LLC, an Indiana Limited Liability Company ("DCI"). The parties agree as follows:

### Recitals

**WHEREAS,** Borrower and DCI entered into that certain Secured Promissory Note dated August 8, 2002, which was amended and replaced with that certain First Amended Secured Promissory Note dated August 31, 2003 and that certain Second Ameded Secured Promissory Note dated July 1, 2004, and the Third Amendment to Secured Promissory Note dated December 1, 2004 (the original note as amended being hereinafter referred to as the "Note") and the Fourth Amendment to Secured Promissory Note dated July 1, 2005

**WHEREAS,** DCI has agreed to amend the Note in order to increase the amount which Borrower may borrow under the Note to $15,000,000.00;

**WHEREAS,** DCI is willing to amend the Note subject to the terms herein and subject to the amendment of the Note as herein provided;

**NOW THEREFORE,** in consideration of the premises, and the mutual promises herein contained, the parties agree that the Note shall be, and hereby is, amended as provided herein and the parties further agree as follows:

The principal amount of the Note is hereby increased so that the total amount that can be borrowed under the Note is $15,000,000.00.

All other terms and conditions contained in the Note, the Security Agreement and Mortgage or other related documents shall remain the same and shall continue in full force and effect that are not specifically amended herein and shall continue during the term of the Note without change, except to reflect the increase in the amount of the Note and to provide security therefore for the entire amount that may become due under the Note.

**IN WITNESS WHEREOF,** Borrower, and DCI have caused this ~~Fourth~~ Fifth amendment to Secured Promissory Note to be executed as of the day first written above.

DC Investments, LLC,

By: _____

Timothy S. Durham

_____
Daniel Laikin

1

# EXHIBIT B

# PLEDGE AGREEMENT
## EXHIBIT "A"

This PLEDGE AGREEMENT ("Pledge Agreement") is entered into as of the 1st day of August, 2002 by and between Daniel Laikin, an Indiana resident (the "Pledgor"), and DC Investments, LLC., an Indiana limited liability corporation (the "Lender").

## WITNESSETH:

WHEREAS, the Lender has provided certain financial accommodations to Pledgor, as evidenced by that certain Promissory Note executed by the Pledgor on behalf of the Lender of even date herewith ("Note"); and

WHEREAS, the Pledgor desires to provide the pledge contemplated by this Pledge Agreement as further consideration and inducement to the Lender to provide such financial accommodations and to collateralize Pledgor's obligations under the Note; and

WHEREAS, it is a condition precedent to the obligations of the Lender that the Pledgor shall execute and deliver this Pledge Agreement and to perform hereunder.

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Pledgor grants a security interest in and pledges those securities (the "Pledged Securities") described in Schedule "A" which is attached hereto and by reference made a part hereof or which may be described in any supplemental schedule which may hereafter be delivered by the Pledgor to the Lender, which supplemental schedule contains a reference to this Pledge Agreement (each a "Supplemental Schedule"). Schedule "A" and any Supplemental Schedule shall constitute a part of this Pledge Agreement.

1. **Liabilities Secured--Certain Definitions.** This Pledge Agreement has been executed by the Pledgor and delivered to the Lender pursuant to the requirements of the Note, the terms of which are incorporated by reference herein. The security interest of the Lender in the Pledged Securities will secure the prompt payment of all amounts payable under the terms of the Note. The term "Event of Default" as used in this Pledge Agreement is as defined in the Note. The terms "Certificated Security," "Uncertificated Security", "Clearing Corporation", "Financial Intermediary", "Issuer" and "Instruction" are used in this Pledge Agreement as defined in the Uniform Commercial Code as enacted in Indiana. The term "Obligations" means all obligations of Pledgor in favor of Lender of every type and description, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including but

1

not limited to: (i) all of such obligations on account of the Note including any advances made pursuant to any extensions beyond the Final Maturity or pursuant to any other amendment thereto.

2. **Perfection of Pledge.** If any Pledged Security is an Uncertificated Security, this Pledge Agreement in and of itself will constitute an Instruction to the Issuer of the Security to register the security interest of the Lender and the Pledgor will execute and deliver any other Instruction to the Issuer to register the security interest of the Lender that the Lender may reasonably request. If any Pledged Security is in the custody of or is registered to a Clearing Corporation, Financial Intermediary or other third party, this Pledge Agreement in and of itself will constitute notice to any such third party of the security interest of the Lender. The Pledgor will execute and deliver to the Lender any "stock power," "bond power," or other instrument of assignment and any financing statement, Instruction or other instrument deemed necessary by the Lender to further evidence or perfect the Lender's security interest. The Lender may file any financing statement to perfect its security interest signed by the Lender or by the Pledgor alone. The Pledgor appoints and constitutes the Lender as its agent and as the Pledgor's attorney-in-fact for the purposes of: (i) executing instruments of assignment of any Pledged Security which is a Certificated Security, including "stock powers" and "bond powers"; (ii) issuing any instruction or taking any other action necessary to cause the Lender's security interest to be registered on the books of the Issuer of any Uncertificated Security and (iii) giving notice of the Lender's security interest to any Clearing Corporation, Financial Intermediary or other third party which is the registered owner of or is in possession of any Pledged Security. Such appointment and such power are irrevocable so long as any Obligations are secured by the pledge and security interest evidenced by this Pledge Agreement and so long as the Lender has any obligation to make any advance which would be so secured when made.

3. **Proceeds· Special Distributions.** The Lender's security interest will extend to the proceeds of any Pledged Securities and any Securities that may be acquired by the Pledgor by reason of any reinvestment of such proceeds. The Lender's security interest will also extend to any cash, securities or any other property which may be or become payable or distributable to the Pledgor on account of any Pledged Securities, including any cash, securities or other property payable or distributable on account of any cash dividend, stock redemption, stock split, stock dividend or any other dividend payable in property other than cash and any cash payable upon the maturity of any Pledged Security which is a debt security; provided, however, that so long as no Event of Default has occurred and is continuing, the Pledgor may retain free of the Lender's security interest any regular cash dividends and any interest payments made on account of any Pledged Securities. The Pledgor will deliver to the Lender any certificates which the Pledgor may receive representing any securities which are subject to the Lender's security interest together with appropriate "stock powers" or

2

"bond powers" or other appropriate instruments of assignment.

4. Representations and Warranties. The Pledgor represents, warrants and covenants that the Pledgor is the owner of all of the initial Pledged Securities and will be the owner of any Pledged Securities hereafter delivered to the Lender or which may otherwise be subjected to the Lender's security interest under this Pledge Agreement, free of any other security interests or any interest whatever of any other party, and that the Pledgor has and will continue to have full power, right and authority to grant to the Lender a pledge of and a security interest in all Pledged Securities. Neither the execution or delivery of this Pledge Agreement nor the consummation of the transactions contemplated hereby, nor the compliance with or performance of the terms and conditions of this Pledge Agreement by the Pledgor is prevented by, limited by, conflicts with or will result in the breach or violation of or a default under the terms, conditions or provisions of (i) any mortgage, security agreement, indenture, evidence of indebtedness, loan or financing agreement, trust agreement, stockholder agreement, or other agreement or instrument to which the Pledgor is a party or by which he is bound or ( ii) any provision of law, any order of any court or administrative agency or any rule or regulation applicable to the Pledgor, subject to applicable state and federal securities laws. There are no actions, suits or proceedings (whether or not purportedly on behalf of the Pledgor) pending or, to the best knowledge of the Pledgor, threatened affecting the Pledgor that involve the Pledged Securities. All consents or approvals, if any, required as a condition precedent to or in connection with the due and valid execution, delivery and performance by the Pledgor of this Pledge Agreement have been obtained, subject to applicable state and federal securities laws.

5. Voting Rights. Unless an Event of Default shall have occurred and be continuing, the Pledgor shall be entitled to exercise all voting rights with respect to the Pledged Securities and to execute consents in respect thereof, and to consent to, ratify or waive notice of any or all meetings of the holders of securities of a class of which any of the Pledged Securities are a part with the same force and effect as if this Pledge Agreement had not been executed and delivered; provided, that the Pledgor shall not exercise voting and similar rights reserved to the Pledgor in a manner materially adverse to the interests of the Lender under any of the Loan Documents. If necessary and upon the receipt of the written request from the Pledgor, the Lender shall from time to time execute and deliver appropriate proxies to enable the Pledgor to exercise the voting and similar rights reserved to the Pledgor.

6. Remedies. Upon the occurrence of an Event of Default, the Lender shall have all the rights, remedies and options in and to the Pledged Securities of a secured party under the Uniform Commercial Code as enacted in Indiana, regardless of whether the Code in such form has been enacted in any jurisdiction in which the Lender asserts

3

other party primarily or secondarily liable with respect to any of the Obligations, and (vii) extend credit accommodations to the Pledgor in addition to those extended under the Note as they exist as of the date of this Pledge Agreement. Pledgor hereby consents to allowing Lender to use the Pledged Securities as collateral for Loans to be received by Lender.

9. **Miscellaneous.** This Pledge Agreement shall be binding upon the Pledgor and upon the Pledgor's legal representatives, successors and assigns. If any provision of this Pledge Agreement is determined to be illegal or unenforceable, such provision shall be deemed to be severable from the balance of the provisions of this Pledge Agreement and the remaining provisions shall be unenforceable in accordance with their terms. This Pledge Agreement is made under and will be governed in all cases by the substantive laws of the State of Indiana, notwithstanding the fact that Indiana conflicts of laws might otherwise require the substantive rules of law of another jurisdiction to apply.

Dated: August 1, 2002

Daniel Laikin

DC Investments, LLC

Timothy S. Durham, Managing Member

5

## SCHEDULE "A"

Attached to and forming a part of the Pledge Agreement executed by Daniel Laikin in favor of DC Investments, LLC dated this 1st day of August 2002.

## DESCRIPTION OF PLEDGED SECURITIES

All rights, title and interests of Daniel Laikin in certain limited partnership interest in Obsidian Capital Partners, I.P, a Delaware limited partnership.


**Daniel Laikin**


6

## PLEDGE AGREEMENT
## EXHIBIT "A"

This PLEDGE AGREEMENT ("Pledge Agreement") is entered into as of the 8th day of August, 2002 by and between Daniel Laikin, an Indiana resident (the "Pledgor"), and DC Investments, LLC., an Indiana limited liability corporation (the "Lender").

### WITNESSETH:

WHEREAS, the Lender has provided certain financial accommodations to Pledgor, as evidenced by that certain Promissory Note executed by the Pledgor on behalf of the Lender of even date herewith ("Note"); and

WHEREAS, the Pledgor desires to provide the pledge contemplated by this Pledge Agreement as further consideration and inducement to the Lender to provide such financial accommodations and to collateralize Pledgor's obligations under the Note; and

WHEREAS, it is a condition precedent to the obligations of the Lender that the Pledgor shall execute and deliver this Pledge Agreement and to perform hereunder.

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Pledgor grants a security interest in and pledges those securities (the "Pledged Securities") described in Schedule "A" which is attached hereto and by reference made a part hereof or which may be described in any supplemental schedule which may hereafter be delivered by the Pledgor to the Lender, which supplemental schedule contains a reference to this Pledge Agreement (each a "Supplemental Schedule"). Schedule "A" and any Supplemental Schedule shall constitute a part of this Pledge Agreement.

1, Liabilities Secured--Certain Definitions. This Pledge Agreement has been executed by the Pledgor and delivered to the Lender pursuant to the requirements of the Note, the terms of which are incorporated by reference herein. The security interest of the Lender in the Pledged Securities will secure the prompt payment of all amounts payable under the terms of the Note. The term "Event of Default" as used in this Pledge Agreement is as defined in the Note. The terms "Certificated Security, " "Uncertificated Security", "Clearing Corporation", "Financial Intermediary", "Issuer" and "Instruction" are used in this Pledge Agreement as defined in the Uniform Commercial Code as enacted in Indiana. The term "Obligations" means all obligations of Pledgor in favor of Lender of every type and description, direct or indirect, absolute contingent, due or to become due, now existing or hereafter arising, including but

1

not limited to: (i) all of such obligations on account of the Note including any advances made pursuant to any extensions beyond the Final Maturity or pursuant to γ other amendment thereto.

2. Perfection of Pledge. If any Pledged Security is an Uncertificated Security, this Pledge Agreement in and of itself will constitute an Instruction to the Issuer of the Security to register the security interest of the Lender and the Pledgor will execute and deliver any other Instruction to the Issuer to register the security interest of the Lender that the Lender may reasonably request. If any Pledged Security is in the custody of or is registered to a Clearing Corporation, Financial Intermediary or other third party, this Pledge Agreement in and of itself will constitute notice to any such third party of the security interest of the Lender. The Pledgor will execute and deliver to the Lender any "stock power," "bond power," or other instrument of assignment and any financing statement, Instruction or other instrument deemed necessary by the Lender to further evidence or perfect the Lender's security interest. The Lender may file any financing statement to perfect its security interest signed by the Lender or by the Pledgor alone. The Pledgor appoints and constitutes the Lender as its agent and as the Pledgor's attorney-in-fact for the purposes of: (i) executing instruments of assignment of any Pledged Security which is a Certificated Security, including "stock powers" and "bond powers"; (ii) issuing any instruction or taking any other action necessary to cause the Lender's security interest to be registered on the books of the Issuer of any ''·certificated Security and (iii) giving notice of the Lender's security interest to any .earing Corporation, Financial Intermediary or other third party which is the registered owner of or is in possession of any Pledged Security. Such appointment and such power are irrevocable so long as any Obligations are secured by the pledge and security interest evidenced by this Pledge Agreement and so long as the Lender has any obligation to make any advance which would be so secured when made.

3. Proceeds- Special Distributions. The Lender's security interest will extend to the proceeds of any Pledged Securities and any Securities that may be acquired by the Pledgor by reason of any reinvestment of such proceeds. The Lender's security interest will also extend to any cash, securities or any other property which may be or become payable or distributable to the Pledgor on account of any Pledged Securities, including any cash, securities or other property payable or distributable on account of any cash dividend, stock redemption, stock split, stock dividend or any other dividend payable in property other than cash and any cash payable upon the maturity of any Pledged Security which is a debt security; provided, however, that so long as no Event of Default has occurred and is continuing, the Pledgor may retain free of the Lender's security interest any regular cash dividends and any interest payments made on account of any Pledged Securities. The Pledgor will deliver to the Lender any ·tificates which the Pledgor may receive representing any securities which are . .oject to the Lender's security interest together with appropriate "stock powers" or

2

10-50494-pmc    Doc 101    FILED 04/09/10    ENTERED 04/09/10 17:08:40    Page 35 of 85

"bond powers" or other appropriate instruments of assignment.

4. <u>Representations and Warranties.</u> The Pledgor represents, warrants and covenants that the Pledgor is the owner of all of the initial Pledged Securities and will be the owner of any Pledged Securities hereafter delivered to the Lender or which may otherwise be subjected to the Lender's security interest under this Pledge Agreement, free of any other security interests or any interest whatever of any other party, and that the Pledgor has and will continue to have full power, right and authority to grant to the Lender a pledge of and a security interest in all Pledged Securities. Neither the execution or delivery of this Pledge Agreement nor the consummation of the transactions contemplated hereby, nor the compliance with or performance of the terms and conditions of this Pledge Agreement by the Pledgor is prevented by, limited by, conflicts with or will result in the breach or violation of or a default under the terms, conditions or provisions of (i) any mortgage, security agreement, indenture, evidence of indebtedness, loan or financing agreement, trust agreement, stockholder agreement, or other agreement or instrument to which the Pledgor is a party or by which he is bound or ( ii) any provision of law, any order of any court or administrative agency or any rule or regulation applicable to the Pledgor, subject to applicable state and federal securities laws. There are no actions, suits or proceedings (whether or not purportedly on behalf of the Pledgor) pending or, to the best knowledge of the Pledgor, threatened affecting the Pledgor that involve the Pledged Securities. All consents or approvals, if any, required as a condition precedent to or in connection with the due and valid execution, delivery and performance by the Pledgor of this Pledge Agreement have been obtained, subject to applicable state and federal securities laws.

5. <u>Voting Rights.</u> Unless an Event of Default shall have occurred and be continuing, the Pledgor shall be entitled to exercise all voting rights with respect to the Pledged Securities and to execute consents in respect thereof, and to consent to, ratify or waive notice of any or all meetings of the holders of securities of a class of which any of the Pledged Securities are a part with the same force and effect as if this Pledge Agreement had not been executed and delivered; provided, that the Pledgor shall not exercise voting and similar rights reserved to the Pledgor in a manner materially adverse to the interests of the Lender under any of the Loan Documents. If necessary and upon the receipt of the written request from the Pledgor, the Lender shall from time to time execute and deliver appropriate proxies to enable the Pledgor to exercise the voting and similar rights reserved to the Pledgor.

6. <u>Remedies.</u> Upon the occurrence of an Event of Default, the Lender shall have all the rights, remedies and options in and to the Pledged Securities of a secured party under the Uniform Commercial Code as enacted in Indiana, regardless of whether the Code in such form has been enacted in any jurisdiction in which the Lender asserts

3

such remedies, and all other rights and remedies provided by law. In exercising any such remedies the Lender may sell all or any portion of the Pledged Securities as a unit, even though the price obtained may be in excess of the amount remaining unpaid the Obligations. The Lender or any holder of any Obligations may purchase the Pledged Securities or any part thereof at any sale or sales. Any requirements of the Uniform Commercial Code as to reasonable notice shall be met by giving notice to the Pledgor ten (10) days prior to such sale or other event giving rise to the requirement for notice.

     7. <u>Application of Proceeds.</u> The proceeds of any sale of all or any part of the Pledged Securities, and any other cash at the time held by the Lender under this Pledge Agreement, shall be applied by the Lender in the following order:

     a. to the payment of the costs and expenses of any such sale, including reasonable compensation to the Lender and its agents and counsel, and all other expenses, Obligations and advances made or incurred by the Lender in connection herewith;

     b. to the payment of any other of the Obligations in such order as the Lender may determine, and

     c. after all Obligations have been satisfied and the Lender no longer has any obligation to make any advance which would result in the creation of an Obligation, to the payment to the Pledgor, or the Pledgor's successors or assigns, or as a court of competent jurisdiction may direct, of any surplus then remaining from such proceeds.

     8. <u>Pledge Absolute.</u> This Pledge Agreement and the pledge and security interest provided for hereunder shall be absolute and unconditional, notwithstanding the irregularity, invalidity or unenforceability of the Note and shall not be affected or impaired by any failure, negligence or omission on the part of the Lender to realize upon or protect any other collateral for any of the Obligations. The Lender may from time to time without notice to the Pledgor and without affecting the Lender's security interest in the Pledged Securities: (i) obtain a security interest in any other property of the Pledgor to secure any of the Obligations; (ii) obtain the primary or secondary liability of any party or parties with respect to any of the Obligations; (iii) extend or renew any of the Obligations for any period beyond their original due dates; (iv) release or compromise any liability of any party or parties primarily or secondarily liable on any of the Obligations; (v) release any security interest that the Lender now has or may hereafter obtain in any property securing any of the Obligations and permit any substitution or exchange of any such property; (vi) resort to the Pledged Securities for payment of the Obligations whether or not the Lender shall have resorted to any other property securing any of the Obligations or shall have proceeded against any

4

other party primarily or secondarily liable with respect to any of the Obligations, and (vii) extend credit accommodations to the Pledgor in addition to those extended under the Note as they exist as of the date of this Pledge Agreement. Pledgor hereby consents to allowing Lender to use the Pledged Securities as collateral for Loans to be received by Lender.

9. **Miscellaneous.** This Pledge Agreement shall be binding upon the Pledgor and upon the Pledgor's legal representatives, successors and assigns. If any provision of this Pledge Agreement is determined to be illegal or unenforceable, such provision shall be deemed to be severable from the balance of the provisions of this Pledge Agreement and the remaining provisions shall be unenforceable in accordance with their terms. This Pledge Agreement is made under and will be governed in all cases by the substantive laws of the State of Indiana, notwithstanding the fact that Indiana conflicts of laws might otherwise require the substantive rules of law of another jurisdiction to apply.

Dated: August 8, 2002

**Daniel Laikin**

_____

**DC Investments, LLC**

_____

**Timothy S. Durham, Managing Member**

5

## SCHEDULE "A"

Attached to and forming a part of the Pledge Agreement executed by Daniel Laikin in favor of DC Investments, LLC dated this 8th day of August 2002.

## DESCRIPTION OF PLEDGED SECURITIES

210,000 shares of common stock of Brightpoint Inc
12,700 shares of common stock of J2 Communications.
All of the above shares have been transferred or will be transferred to account #885-23467-10 with Securites Research, Inc in an account of Timothy S. Durham

Daniel Laikin

6

# EXHIBIT C

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

DC Investments, LLC
111 Monument Circle
Suite 4800
Indianapolis, IN 46204
Attn: Timothy S. Durham

# DEED OF TRUST

**This Deed of Trust,** made this 30ᵗʰ day of July, 2004, between **Daniel Laikin,** a married man, whose address is 8159 Hollywood Blvd., West Hollywood, CA 90069-1609, herein called Trustor, **Gary D. Sallee,** 124 Convoy St., Playa Del Rey, CA 90293, herein called Trustee, and **DC Investments, LLC,** 111 Monument Circle, Suite 4800, Indianapolis, IN 46204, herein called Beneficiary,

**Witnesseth:**   That Trustor **IRREVOCABLY GRANTS, TRANSFERS AND ASSIGNS TO TRUSTEE IN TRUST, WITH POWER OF SALE,** that property, consisting of one or more parcels, in Los Angeles County, California, described at Attachment A hereto, which attachment is incorporated herein,

TOGETHER WITH the rents, issues and profits thereof, SUBJECT, HOWEVER, to the right, power and authority given to and conferred upon Beneficiary by paragraph (10) of the provisions herein to collect and apply such rents, issues and profits.

**For the Purpose of Securing:**  1. Performance of each agreement of Trustor incorporated by reference or contained herein. 2. Payment of the indebtedness evidenced that certain Second Amended Secured Promissory Note (Line of Credit), Dated July 1, 2003, and any amendment, extension or renewal thereof, in the principal sum of $7,000,000.00 executed by Trustor in favor of Beneficiary. 3. Payment of such further sums as the then record owner of said property may borrow from Beneficiary, when evidenced by another note (or notes) reciting it is so secured.

**To Protect the Security of This Deed of Trust, Trustor Agrees:**

(1) To keep said property in good condition and repair, not to remove or demolish any building thereon, to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon and to pay when due all claims for labor performed and materials furnished therefor, to comply with all laws affecting said property or requiring any alterations or improvements to be made thereon, not to commit or permit waste thereof, not to commit, suffer or permit any act upon said property in violations of law to cultivate, irrigate, fertilize, fumigate, prune and do all other acts which from the character or use of said property may be reasonably necessary, the specific enumerations herein not excluding the general

(2) To provide maintain and deliver to Beneficiary fire insurance satisfactory to and with loss payable to Beneficiary.  The amount collected under any fire or other insurance policy may be applied by Beneficiary upon indebtedness secured hereby and in such order as Beneficiary may determine, or at option of Beneficiary the entire amount so collected or any part thereof may be released to Trustor. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

1

(3) To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee, and to pay all costs and expenses including cost of evidence of title and attorney's fees in a reasonable sum, in any such action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Deed.

(4) To pay at least ten days before delinquency all taxes and assessments affecting said property, including assessments on appurtenant water stock, when due, all encumbrances, charges and liens, with interest, on said property or any part thereof, which appear to be prior or superior hereto, all costs, fees and expenses of this Trust.

Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary or Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof Beneficiary or Trustee being authorized to enter upon said property for such purposes; appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee, pay, purchase, contest or compromise any encumbrance, charge or lien which in the judgment of either appears to be prior or superior hereto, and in exercising any such powers, pay necessary expenses, employ counsel and pay his reasonable fees.

(5) To pay immediately and without demand all sums so expended by Beneficiary or Trustee, with interest from date of expenditure at the amount allowed by law in effect at the date hereof, and to pay for any statement provided for by law in effect at the date hereof regarding the obligation secured hereby any amount demanded by the Beneficiary not to exceed the maximum allowed by law at the time when said statement is demanded.

(6) That any award of damages in connection with any condemnation for public use of or injury to said property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such moneys received by him in the same manner and with the same effect as above provided for disposition of proceeds of fire or other insurance.

(7) That by accepting payment of any sum secured hereby after its due date, Beneficiary does not waive his rights either to require prompt payment when due of all other sums so secured or to declare default for failure so to pay.

(8) That at any time or from time to time, without liability therefor and without notice, upon written request of Beneficiary and presentation of this Deed and said note for endorsement, and without affecting the personal liability of any person for payment of the indebtedness secured hereby, Trustee may reconvey any part of said property, consent to the making of any map or plot thereof; join in granting any easement thereon; or join in any extension agreement or any agreement subordinating the lien or charge hereof.

(9) That upon written request of Beneficiary state that all sums secured hereby have been paid, and upon surrender of this Deed and said note to Trustee for cancellation and retention and upon payment of its fees, Trustee shall reconvey, without warranty, the property then held hereunder. The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof. The grantee in such reconveyance may be described as "The person or persons legally entitled thereto." Five years after issuance of such full reconveyance, Trustee may destroy said note and this Deed (unless directed in such request to retain them).

(10) That as additional security, Trustor hereby give to and confers upon Beneficiary the right, power and authority, during the continuance of these Trusts, to collect the rents, issues and profits of said property, reserving unto Trustor the right, prior to any default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, to collect the rents, issues and profits of said property, reserving unto Trustor the right, prior to any default

2

by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, to collect and retain such rents, issues and profits as they become due and payable. Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of said property or any part thereof, in his own name sue for or otherwise collect such rents, issues and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees. Upon any indebtedness secured hereby, and in such order as Beneficiary may determine. The entering upon and taking possession of said property, the collection of such rents, issues and profits and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(11) That upon default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, Beneficiary may declare all sums secured hereby immediately due and payable by delivery to Trustee of written declaration of default and demand for sale or of written notice of default and of election to cause to be sold said property which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed, said note and all documents evidencing expenditures secured hereby.

After the lapse of such time as may then be required by law following the recordation of said notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell said property at the time and place fixed by it in said notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of said property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement Trustee shall deliver to such purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee, or Beneficiary as hereinafter defined, may purchase at such sale.

After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof, all other sums then secured hereby, and the remainder, if any, to the person or persons legally entitled thereto.

(12) Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this Deed is recorded and the name and address of the new Trustee.

(13) That this Deed applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns. The term Beneficiary shall mean the owner and holder, including pledgees, of the note secured hereby whether or not named as Beneficiary herein in this Deed, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

(14) That Trustee accepts this Trust when this Deed, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party hereto of

pending sale under any other Deed of Trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.

The undersigned Trustor requests that a copy of any Notice of Default and of any Notice of Sale hereunder be mailed to him at the address hereinbefore set forth.

_____
Daniel Lalkin

STATE OF CALIFORNIA }
COUNTY OF LOS ANGELES} S.S.
On February 14, 2009, before me, *LaDawn Scott, Notary Public* (here insert name and title of the officer), personally appeared Daniel Lalkin, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

LA DAWN SCOTT
Commission # 1387330
Notary Public - California
Los Angeles County
My Comm. Expires Nov 26 2006

4

---
## DO NOT RECORD
---

### REQUEST FOR FULL RECONVEYANCE

To be used only when note has been paid:

To Gary D. Sallee, Trustee

Dated _____

    The undersigned is the legal owner and holder of all indebtedness secured by the within Deed of Trust. All sums secured by said Deed of Trust have been fully paid and satisfied; and you are hereby requested and directed, on payment to you of any sums owing to you under the terms of said Deed of Trust, to cancel all evidences of indebtedness, secured by said Deed of Trust, delivered to you herewith together with said Deed of Trust, and to reconvey, without warranty, to the parties designated by the terms of said Deed of Trust, the estate now held by you under the same.

DC Investments, LLC

By: __ _____ ___ ___ ___ ___ ___ __

**MAIL RECONVEYANCE TO:**  DC Investments, LLC

Do not lose or destroy this Deed of Trust OR THE NOTE which it secures. Both must be delivered to the Trustee for cancellation before reconveyance will be made.

5

3/5/04

4

ORDER NO  LA0430179

EXHIBIT "A"

### PARCEL 1:

A PORTION OF LOT 9 OF TRACT NO. 6472, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 75, PAGES 22 AND 23 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY CORNER OF SAID LOT 9, WHICH CORNER IS A POINT IN THE EASTERLY BOUNDARY LINE OF LAUREL VIEW DRIVE, AND IS A POINT COMPOUND CURVATURE THROUGH WHICH POINT A TANGENT TO THE CURVE BEARS NORTH 30° 06' 10" EAST; THENCE SOUTHWESTERLY ON THE ARC OF A CURVE CONCAVE TO THE NORTHWEST AND OF RADIUS OF 151.50 FEET, A DISTANCE OF 31.07 FEET TO A POINT OF COMPOUND CURVATURE, THROUGH WHICH A TANGENT TO THE CURVE BEARS SOUTH 41° 51' 10" WEST; THENCE SOUTH 49° 04' 00" EAST, A DISTANCE OF 73.69 FEET, MORE OR LESS, TO A POINT IN THE EASTERLY BOUNDARY LINE OF SAID LOT 9, WHICH POINT IS AT THE END OF A CURVE CONCAVE TO THE NORTHWEST, AND OF RADIUS OF 14.92 FEET; THENCE FOLLOWING THE EASTERLY AND NORTHEASTERLY BOUNDARY OF SAID LOT 9, NORTH 3° 30' 28" WEST, AND TANGENT TO THE LAST MENTIONED CURVE AT ITS POINT OF ENDING, A DISTANCE OF 53.66 FEET TO THE NORTHEAST CORNER OF SAID LOT 9, THENCE NORTH 59° 53' 50" WEST; A DISTANCE OF 39.50 FEET TO THE POINT OF BEGINNING.

### PARCEL 2:

A PORTION OF LOTS "C" AND "E" OF CIELO VISTA TERRACE, SHEET 2, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 63, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY CORNER OF LOT 9 OF SAID TRACT NO. 6472, WHICH CORNER IS A POINT IN THE EASTERLY BOUNDARY LINE OF LAUREL VIEW DRIVE, AND IS A POINT OF COMPOUND CURVATURE THROUGH WHICH A TANGENT TO THE CURVE BEARS NORTH 30° 06' 10" EAST; THENCE NORTHEASTERLY ON THE ARC OF A CURVE CONCAVE TO THE NORTHWEST AND OF RADIUS OF 84.00 FEET, A DISTANCE OF 15.64 FEET TO THE END OF THE CURVE; THENCE NORTH 19° 26' 10" EAST AND TANGENT TO THE LAST MENTIONED CURVE AT ITS POINT OF ENDING A DISTANCE OF 20.00 FEET TO THE POINT OF BEGINNING OF A CURVE, WHICH IS TANGENT AT ITS POINT OF BEGINNING TO THE LAST MENTIONED COURSE; THENCE NORTHEASTERLY ON THE ARC OF THE CURVE, WHICH IS CONCAVE TO THE SOUTHEAST AND OF RADIUS OF 55.00 FEET, A DISTANCE OF 18.72 FEET TO THE END OF THE CURVE, THENCE NORTH 38° 56' 10" EAST AND TANGENT TO THE LAST MENTIONED CURVE AT ITS POINT OF ENDING, A DISTANCE OF 21.00 FEET TO THE POINT OF BEGINNING OF A CURVE, WHICH IS TANGENT AT ITS POINT OF ENDING TO THE LAST MENTIONED COURSE; THENCE NORTHEASTERLY ON THE ARC OF THE CURVE, WHICH IS CONCAVE TO THE NORTHWEST AND OF RADIUS OF 133.78 FEET, A DISTANCE OF 5.00 FEET TO A POINT THROUGH WHICH A TANGENT TO THE CURVE BEARS NORTH 36° 47' 40" EAST; THENCE SOUTH 53° 56' 10" EAST A DISTANCE OF 75.93 FEET, MORE OR LESS, TO A POINT, THE MOST NORTHERLY CORNER OF LOT 10 IN THE NORTHWESTERLY BOUNDARY OF LOT 10 OF AFORESAID TRACT NO. 6472; THENCE FOLLOWING THE NORTHWESTERLY BOUNDARY LINE

*** LEGAL DESCRIPTION CONTINUED ***

## 04 0525306

3/5/04

5

ORDER NO. LA0430179

OF SAID LOT 10 AND THE NORTHEASTERLY BOUNDARY LINE OF SAID LOT 9, SOUTH 55° 48' 40" WEST A DISTANCE OF 79.51 FEET TO THE NORTHEAST CORNER OF SAID LOT 9; THENCE NORTH 59° 53' 50" WEST A DISTANCE OF 39.50 FEET TO THE POINT OF BEGINNING.

PARCEL 3:

THAT PORTION OF LOT "C" OF CIELO VISTA TERRACE, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST EASTERLY NORTHEAST CORNER OF SAID LOT; THENCE ALONG THE EASTERLY LINE OF SAID LOT, SOUTH 5° 32' 13" WEST 123.40 FEET; THENCE NORTH 85° 44' 35" WEST 121.27 FEET; THENCE NORTH 4° 15' 25" EAST 77.37 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE WEST AND HAVING A RADIUS OF 324.43 FEET; THENCE NORTHERLY ALONG SAID CURVE 63.69 FEET TO A POINT IN THE NORTHEASTERLY LINE OF SAID LOT, A RADIAL LINE OF SAID CURVE TO SAID POINT BEARS NORTH 83° 00' 31" EAST; THENCE ALONG SAID NORTHEASTERLY LINE, SOUTH 78° 11' 00" EAST 131.40 FEET TO THE POINT OF BEGINNING.

EXCEPT THAT PORTION OF SAID LOT CONVEYED TO THE CITY OF LOS ANGELES, BY DEED RECORDED ON FEBRUARY 10, 1926 AS INSTRUMENT NO. 1754, IN BOOK 5579, PAGE 217, OF OFFICIAL RECORDS OF SAID COUNTY.

PARCEL 4:

THOSE PORTIONS OF "C" AND "E" OF CIELO VISTA TERRACE, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS A WHOLE AS FOLLOWS.

BEGINNING AT THE MOST SOUTHERLY CORNER OF SAID LOT "C" BEING ALSO THE MOST EASTERLY CORNER OF SAID LOT "E"; THENCE ALONG THE EASTERLY LINE OF SAID LOT "E", SOUTH 28° 00' 00" WEST 54.30 FEET TO THE MOST EASTERLY CORNER OF TRACT NO. 7325, AS PER MAP RECORDED IN BOOK 129, PAGE 84 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE ALONG THE NORTHEASTERLY LINE OF SAID TRACT NO. 7325, NORTH 49° 56' 10" WEST 117.60 FEET; THENCE NORTH 28° 00' 00" EAST 17.02 FEET; THENCE NORTH 5° 32' 20" EAST 58.43 FEET; THENCE NORTH 0° 26' 10" WEST 12.38 FEET; THENCE NORTH 89° 33' 50" EAST 119.12 FEET TO THE EASTERLY LINE OF SAID LOT "C"; THENCE SOUTHERLY ALONG THE EASTERLY LINE OF SAID LOT "C", A DISTANCE OF 118.15 FEET TO THE POINT OF BEGINNING.

EXCEPT THAT PORTION OF SAID LOTS CONVEYED TO THE CITY OF LOS ANGELES, BY DEED RECORDED ON FEBRUARY 10, 1926 AS INSTRUMENT NO. 1754, IN BOOK 5579, PAGE 217, OF OFFICIAL RECORDS OF SAID COUNTY.

PARCEL 5:

THAT PORTION OF LOT "C" OF CIELO VISTA TERRACE, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

*** LEGAL DESCRIPTION CONTINUED ***

04 0525306

Description: Los Angeles,CA Document-Year.DocID 2004.525306 Page: 5 of 7
Order: 00000005556 Comment:

3/5/04

6

ORDER NO. LA0430179

BEGINNING AT THE NORTHWEST CORNER OF THE LAND DESCRIBED AS PARCEL 2 IN DEED TO MAHLON M. DELP, RECORDED IN BOOK 29805, PAGE 41 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE NORTH 0° 26' 10" WEST 23.62 FEET TO THE BEGINNING OF A CURVE CONCAVE EAST AND HAVING A RADIUS OF 224.09 FEET; THENCE NORTHERLY ALONG SAID CURVE 18.29 FEET; THENCE NORTHERLY IN A DIRECT LINE TO THE SOUTHWEST CORNER OF LAND DESCRIBED AS PARCEL 1 IN THE ABOVE MENTIONED DEED TO MAHLON M. DELP; THENCE ALONG THE SOUTHERLY LINE OF SAID PARCEL 1, SOUTH 89° 45' 30" EAST, A DISTANCE OF 121.27 FEET TO THE SOUTHEAST CORNER OF SAID PARCEL 1; THENCE SOUTHERLY IN A DIRECT LINE TO THE NORTHEAST CORNER OF THE LAND DESCRIBED AS PARCEL 2 IN SAID DEED TO MAHLON M. DELP; THENCE SOUTH 89° 33' 50" WEST ALONG THE NORTHERLY LINE OF SAID PARCEL 2, A DISTANCE OF 119.12 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM THAT PORTION CONVEYED TO THE CITY OF LOS ANGELES, BY DEED RECORDED IN BOOK 6578, PAGE 217, OF OFFICIAL RECORDS OF SAID COUNTY.

PARCEL 8:

THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 5, TOWNSHIP 1 SOUTH, RANGE 14 WEST SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF THE SURVEY OF SAID LAND ON FILE IN THE BUREAU OF LAND MANAGEMENT, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF LOT 9 IN BLOCK 51 OF TRACT NO. 2019, AS PER MAP RECORDED IN BOOK 22, PAGES 126 AND 127 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE NORTH 89° 43' 30" EAST ALONG THE EAST PROLONGATION OF THE SOUTH LINE OF SAID LOT 9, A DISTANCE OF 10.04 FEET TO A POINT IN THE WEST BOUNDARY OF LAUREL CANYON ROAD, 40 FEET WIDE; THENCE SOUTH 4° 01' 15" WEST ALONG SAID WEST BOUNDARY, A DISTANCE OF 20.79 FEET; THENCE SOUTHERLY ALONG A CURVE CONCAVE TO THE EAST, TANGENT AT ITS POINT OF BEGINNING TO THE LAST MENTIONED COURSE, AND HAVING A RADIUS OF 120 FEET, A DISTANCE OF 99.95 FEET; THENCE SOUTH 43° 42' 15" EAST AND TANGENT TO SAID LAST MENTIONED CURVE AT ITS POINT OF ENDING, A DISTANCE OF 214.35 FEET; THENCE CONTINUING SOUTHEASTERLY ALONG SAID BOUNDARY, THE SAME BEING A CURVE CONCAVE TO THE SOUTHWEST, TANGENT AT ITS POINT OF BEGINNING TO THE LAST MENTIONED COURSE, SAID HAVING A RADIUS OF 280 FEET, A DISTANCE OF 85.75 FEET; THENCE NORTH 88° 07' 25" WEST, A DISTANCE OF 35.30 FEET; THENCE SOUTHERLY ALONG A CURVE CONCAVE TO THE WEST, TANGENT AT ITS POINT OF BEGINNING TO A LINE BEARING SOUTH 2° 10' 40" WEST, AND HAVING A RADIUS OF 105 FEET, A DISTANCE OF 52.02 FEET; WHERE A TANGENCY TO SAID CURVE BEARS SOUTH 30° 17' 45" WEST; THENCE SOUTH 89° 57' 30" EAST, A DISTANCE OF 65 FEET TO THE NORTHWEST CORNER OF THAT CERTAIN PARCEL OF LAND CONVEYED TO FIDEL LA BARBA, BY DEED RECORDED IN BOOK 6070, PAGE 55 OF OFFICIAL RECORDS; THENCE SOUTH 12° 51' 00" EAST ALONG THE WESTERLY LINE AND ITS PROLONGATION SOUTHERLY OF SAID PARCEL, A DISTANCE OF 410.22 FEET; THENCE SOUTHEASTERLY ALONG A CURVE CONCAVE TO THE NORTHEAST, TANGENT AT ITS POINT OF BEGINNING TO THE LAST MENTIONED COURSE, AND HAVING A RADIUS OF 595 FEET, A DISTANCE OF 11.19 FEET, WHERE A TANGENCY TO SAID CURVE BEARS SOUTH 13° 55' 40" EAST; THENCE NORTH 76° 04' 20" EAST, A DISTANCE OF 75 FEET TO A POINT IN THE WEST LINE OF SAID LAUREL CANYON ROAD; THENCE SOUTHEASTERLY ALONG THE WEST BOUNDARY OF LAUREL CANYON ROAD, THE SAME BEING A CURVE CONCAVE TO THE EAST, TANGENT AT ITS POINT OF BEGINNING TO A LINE BEARING SOUTH 13° 55' 40" EAST AND HAVING A RADIUS OF 520 FEET, A DISTANCE OF 35.90 FEET; THENCE ALONG THE WESTERLY BOUNDARY OF LAUREL CANYON ROAD, AS DESCRIBED IN DEED RECORDED IN BOOK 6578, PAGE 217 OF

*** LEGAL DESCRIPTION CONTINUED ***

04 0525306

04 0525306

Description: Los Angeles, CA Document-Year.DocID 2004.525306 Page: 6 of 7
Order: 00000005556 Comment:

3/5/04

7

ORDER NO. LA0430179

OFFICIAL RECORDS OF SAID COUNTY, SOUTH 17° 53' 00" EAST AND TANGENT TO SAID LAST MENTIONED CURVE, AT ITS POINT OF ENDING, A DISTANCE OF 153.80 FEET; THENCE CONTINUING SOUTHERLY ALONG THE WESTERLY BOUNDARY OF LAUREL CANYON ROAD AND HOLLYWOOD BOULEVARD, THE SAME BEING A CURVE CONCAVE TO THE WEST, TANGENT AT ITS POINT OF BEGINNING TO THE LAST MENTIONED COURSE, AND HAVING A RADIUS OF 439.43 FEET TO THE NORTHERLY LINE OF LOT "C" OF CIELO VISTA TERRACE, SHEET NO. 2, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE IN A GENERAL WESTERLY AND NORTHWESTERLY DIRECTION ALONG THE NORTHERLY LINE OF CIELO VISTA TERRACE SHEET NO. 2, FOLLOWING THE SAME IN ALL ITS VARIOUS COURSES AND DISTANCES TO THE NORTHWESTERLY CORNER OF LOT "A", SAID CIELO VISTA TERRACE SHEET NO. 2; THENCE NORTHERLY ALONG THE NORTHERLY PROOLONGATION OF THE WESTERLY LINE OF SAID LOT "A" TO A POINT IN THE NORTH LINE 852.66 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM THAT PORTION OF SAID LAND DESCRIED IN THE DEED FROM FRED RICHARD SALTER TO VIRGINIA LOUISE SALTER, RECORDED ON NOVEMBER 8, 1935, IN BOOK 13755, PAGE 259 OF OFFICIAL RECORDS OF SAID COUNTY.

PARCEL 7:

LOT "A" OF TRACT NO. 7325, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 129, PAGE 84 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 8:

AN EASEMENT FOR INGRESS AND EGRESS AND LANDSCAPING, WALLS, PLANTERS AND IRRIGATION PURPOSES OVER THAT PORTION OF LOT "C", CIELO VISTA TERRACH, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

COMMENCING AT THE MOST NORTHERLY CORNER OF THAT PARCEL OF LAND DESCRIBED IN DEED RECORDED IN BOOK 5649, PAGE 134, OFFICIAL RECORDS, THENCE SOUTHERLY ALONG THE WESTERLY LINE OF SAID LAND, SAID WESTERLY LINE BEING A CURVE CONCAVE TO THE NORTHWEST, HAVING A RADIUS OF 133.76 FEET, A DISTANCE OF 5.00 FEET; THENCE SOUTH 39° 56' 10" WEST A DISTANCE OF 21.00 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 55.00 FEET; THENCE SOUTHERLY ALONG SAID CURVE, A DISTANCE OF 5.93 FEET THROUGH A CENTRAL ANGLE OF 6° 10' 28" TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING SOUTHERLY ALONG SAID CURVE A DISTANCE OF 3.53 FEET THROUGH A CENTRAL ANGLE OF 3° 40' 48" TO THE BEGINNING OF A CURVE CONCAVE TO THE SOUTHWEST HAVING A RADIUS OF 90.23 FEET, A RADIAL LINE HAVING A BEARING OF NORTH 76° 37' 01" WEST; THENCE NORTHERLY ALONG SAID CURVE A DISTANCE OF 3.00 FEET THROUGH A CENTRAL ANGLE OF 1° 54' 18"; THENCE NORTH 85° 48' 07" EAST 1.22 FEET TO THE TRUE POINT OF BEGINNING.

04 0525306

EXHIBIT "A"

LEGAL DESCRIPTION

3

COUNTY OF LOS ANGELES, STATE OF CALIFORNIA.

PARCEL A:

Parcel 46, as shown on a Record of Survey filed in Book 57 Pages
47 to 50 inclusive of Record of Surveys, in the office of the
county recorder of said county.

EXCEPT therefrom all minerals, oil, petroleum, asphaltum, gas,
coal, and other hydrocarbon substances in, on, within and under
said lands and every part thereof, but without surface right of
entry, as reserved by Marblehead Land Company, in deed recorded
April 14, 1949 in Book 29843 Page 93, Official Records.

PARCEL B:

An easement for pedestrian travel, bathing and recreational
purposes over Lot 23 of Tract 13019, recorded in Book 282 Pages
26, 27 and 28 of Maps, in the office of the county recorder of
said county, on August 19, 1946, as Instrument No. 3129.

PARCEL C:

An easement or right of way for road purposes only for ingress
and egress to and from said lands over those lands called
easements No. 1 to 6 inclusive and described by metes and bounds
in that certain instrument designated as "Declaration of
Easements", filed for record May 9, 1947 as Instrument No. 2676,
in the office of the county recorder of said county.

95   460901

10-50494-pmc   Doc 101   FILED 04/09/10   ENTERED 04/09/10 17:08:40   Page 52 of 85

This page is part of your document - DO NOT DISCARD

**04 0525306**

RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA
03/05/04 AT 08:00am

TITLE(S) :                    DEED

L E A D   S H E E T

FEE

| FEE $22 | JJ |
|---------|----|
|         | 6  |

CODE
20

CODE
19

CODE
9

TRANSFER TAX
NOT A PUBLIC RECORD

D.T.T

NOTIFICATION SENT $4

**Assessor's Identification Number (AIN)**
To be completed by Examiner OR Title Company in black ink.     Number of AIN's Shown

5556 007 · 007                         0 0 7

THIS FORM NOT TO BE DUPLICATED

**EQUITY TITLE**                                     3/5/04

RECORDING REQUESTED BY
Equity Title Company
AND WHEN RECORDED MAIL TO
Daniel Laikin
c/o National Lampoon Co
10850 Wilshire Blvd #1000
Los Angeles, CA 90024-4305

## 04 0525306

A P N  5556-028-019 5556-028-014 5556-028-011 5556-028-013 5556-028-012 5556-007-007 and 5556-028-016
Title Order No  LA0430179                    Space Above This Line for Recorder's Use Only

Escrow No  25235-JM

### GRANT DEED

THE UNDERSIGNED (GRANTOR(s) DECLARE(s) DOCUMENTARY TRANSFER TAX   *not a public record*
[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale,
unincorporated area, [ X ] City of Los Angeles, and

**TRANSFER TAX
NOT A PUBLIC RECORD**

Southern Music Publishing Co., Inc., a New York Corporation,  as to Parcels 1, 2, 3, 4, 5, 6, and 6
and Ralph Peer II, as to Parcel 7

hereby GRANT(S) to Daniel S Laikin, a married man as his sole and separate property

the following described property in the City of Los Angeles, County of Los Angeles State of California;

Lot "A" of Tract No 7325, as per map recorded in Book 129, Page 84 of Maps, in the office of the County Recorder of
said County, APN 5556-028-016 and full legal description for APN 5556-028-019, 5556-028-014, 5556-028-011,
5556-028-013, 5556-028-012 and 5556-007-007 is attached hereto as Exhibit "A" and made a part hereof

Southern Music Publishing Co , Inc , a
New York Corporation

By _____
Ralph Peer, II, President

By _____
Donna L Chin-Davis, Secretary


Ralph Peer II, as an individual

Document Date   February 3, 2004

STATE OF CALIFORNIA,
COUNTY OF Contra Costa
On February 6, 2004  before me,  William Reese III  personally appeared
Donna L Chin-Davis
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on
the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument
WITNESS my hand and official seal

Signature _____

**WILLIAM REESE III
COMM. 1342430
NOTARY PUBLIC CALIFORNIA
CONTRA COSTA COUNTY
My Comm. Expires May 2, 2008**

**WILLIAM REESE III
COMM. 1342430
NOTARY PUBLIC CALIFORNIA
CONTRA COSTA COUNTY
My Comm. Expires May 2, 2008**

This area for official notarial seal

LA0430179

scription: Los Angeles, CA Document-Year.DocID 2004.525306 Page: 2 of 7
rder: 00000005556 Comment:

3/5/04

3

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of  *Los Angeles*                    } ss

On  *2.11.04*  _____ before me,  *M LaMorie*    Notary Public
                                    (Name and Title of Officer (e.g. Jane Doe, Notary Public))

personally appeared  *Ralph Peer II*
                                    (Name(s) of Signer(s))

☐ personally known to me
☑ proved to me on the basis of satisfactory
evidence

to be the person(s) whose name(s) is/are
subscribed to the within instrument and
acknowledged to me that he/she/they executed
the same in his/her/their authorized
capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s)
acted, executed the instrument.

WITNESS my hand and official seal.

_____
Signature of Notary Public

M LAMORIE
Commission # 1332177
Notary Public – California
Los Angeles County
My Comm. Expires Dec 26, 2005

M LAMORIE
Commission # 1332177
Notary Public – California
Los Angeles County
My Comm. Expires Dec 26, 2005

──────────────── OPTIONAL ────────────────

Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent
fraudulent removal and reattachment of this form to another document.

### Description of Attached Document

Title or Type of Document  *Grant Deed*

Document Date  *2/3/04*                        Number of Pages _____

Signer(s) Other Than Named Above  *Donna L Chin-Davis –
Sect of Southern Music Publishing*

### Capacity(ies) Claimed by Signer

Signer's Name _____

☑ Individual
☑ Corporate Officer — Title(s)  *Pres*
☐ Partner — ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other _____

[RIGHT THUMBPRINT OF SIGNER]
Top of thumb here

Signer is Representing  *Delt de Southern Music
Publishing Co Inc, a ny Grp*

© 1999 National Notary Association • 9350 De Soto Ave, P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.nationalnotary.org    Prod. No. 5907    Reorder: Call Toll-Free 1-800-876-6827

## 04  0525306

Description: Los Angeles,CA Document-Year.DocID 2004.525306 Page: 3 of 7
Order: 00000005556 Comment:



This page is part of your document - DO NOT DISCARD

**04 0525305**

**RECORDED/FILED IN OFFICIAL RECORDS**
**RECORDER'S OFFICE**
**LOS ANGELES COUNTY**
**CALIFORNIA**
**03/05/04 AT 08:00am**

**TITLE(S) :**                          **DEED**



L E A D   S H E E T

FEE                                                                D.T.T

FEE $ 3.00 JJ .5        **A. F. N. F.**  CODE 84

CODE
20

CODE
19        NCPF Code 19    $ 15.00

CODE
9

**Assessor's Identification Number (AIN)**
**To be completed by Examiner OR Title Company in black ink.**          **Number of AIN's Shown**

5556 · 007 · 007                          001

**THIS FORM NOT TO BE DUPLICATED**

Description: Los Angeles,CA Document-Year.DocID 2004.525305 Page: 1 of 6
Order: 00000005556 Comment:

EQUITY TITLE

3/5/04

2

RECORDING REQUESTED BY
Equity Title Company
AND WHEN RECORDED MAIL TO
Daniel S Laikin
c/o National Lampoon
10850 Wilshire Blvd #1000
Los Angeles, CA 90024-4305

04 0525305

_____ Space Above This Line for Recorder's Use Only _____

A P N  5556-028-019-5556-028-014-5556-028-011-5556-028-013-5556-028-012-5556-007-007 and 5556-028-016
Title Order No  LA0430179                                    Escrow No  25235-JM

## QUITCLAIM DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S) DOCUMENTARY TRANSFER TAX  $NONE
[ ] compued on full value of property conveyed, or
[ ] compued on full value less value of liens or encumbrances remaining at time of sale.
unincorporated area,  [ ] City of Los Angeles , and

FOR A VALUABLE CONSIDERATION, Receipt of which is hereby acknowledged,
JACKIE LAIKIN, WIFE OF THE GRANTEE

hereby remise, release and forever quitclaim to
DANIEL S LAIKIN, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY

the following described property in the City of Los Angeles, County of Los Angeles State of California;

Lot "A" of Tract No  7325, as per map recorded in Book 129, Page 84 of Maps, in the office of the County Recorder of
said County, APN 5556-028-016 and full legal description for APN 5556-028-019, 5556-028-014, 5556-028-011,
5556-028-013, 5556-028-012 and 5556-007-007 is attached hereto as Exhibit "A" and made a part hereof

"This conveyance establishes sole and separate property of a spouse, R&T 11911 "

"It is the express intent of the Grantor, being the spouse of the Grantee to convey all right, title and interest of the Grantor,
community or otherwise, in and to the herein described property to the Grantee as her/his sole and separate property "

_Jackie Laikin_
Jackie Laikin

Document Date  February 3, 2004

STATE OF CALIFORNIA                    )SS
COUNTY OF  Los Angeles         )
On  Feb 5, 2004     before me,  LaDawn Scott          Notary Public personally appeared
  Jackie Laikin
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on
the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument
WITNESS my hand and official seal

Signature  _LaDawn Scott_

```
LA DAWN SCOTT
Commission # 1387330
Notary Public - California
Los Angeles County
My Comm. Expires Nov 26, 2005
```
This area for official notarial seal

LA043079

3/5/04

ORDER NO. LA0430170    3

EXHIBIT "A"

PARCEL 1:

A PORTION OF LOT 9 OF TRACT NO. 6472, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 76, PAGES 22 AND 23 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS

BEGINNING AT THE MOST NORTHERLY CORNER OF SAID LOT 9, WHICH CORNER IS A POINT IN THE EASTERLY BOUNDARY LINE OF LAUREL VIEW DRIVE, AND IS A POINT COMPOUND CURVATURE THROUGH WHICH POINT A TANGENT TO THE CURVE BEARS NORTH 30° 06' 10" EAST; THENCE SOUTHWESTERLY ON THE ARC OF A CURVE CONCAVE TO THE NORTHWEST AND OF RADIUS OF 151 50 FEET, A DISTANCE OF 31.07 FEET TO A POINT OF COMPOUND CURVATURE, THROUGH WHICH A TANGENT TO THE CURVE BEARS SOUTH 41° 51' 10" WEST; THENCE SOUTH 49° 04' 00" EAST, A DISTANCE OF 73 69 FEET, MORE OR LESS, TO A POINT IN THE EASTERLY BOUNDARY LINE OF SAID LOT 9, WHICH POINT IS AT THE END OF A CURVE CONCAVE TO THE NORTHWEST, AND OF RADIUS OF 14 92 FEET; THENCE FOLLOWING THE EASTERLY AND NORTHEASTERLY BOUNDARY OF SAID LOT 9, NORTH 3° 30' 25" WEST, AND TANGENT TO THE LAST MENTIONED CURVE AT ITS POINT OF ENDING, A DISTANCE OF 53.68 FEET TO THE NORTHEAST CORNER OF SAID LOT 9, THENCE NORTH 59° 53' 50" WEST, A DISTANCE OF 39 50 FEET TO THE POINT OF BEGINNING.

PARCEL 2:

A PORTION OF LOTS "C" AND "E" OF CIELO VISTA TERRACE, SHEET 2, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS.

BEGINNING AT THE MOST NORTHERLY CORNER OF LOT 9 OF SAID TRACT NO. 6472, WHICH CORNER IS A POINT IN THE EASTERLY BOUNDARY LINE OF LAUREL VIEW DRIVE, AND IS A POINT OF COMPOUND CURVATURE THROUGH WHICH A TANGENT TO THE CURVE BEARS NORTH 30° 06' 10" EAST; THENCE NORTHEASTERLY ON THE ARC OF A CURVE CONCAVE TO THE NORTHWEST AND OF RADIUS OF 84.00 FEET, A DISTANCE OF 15.64 FEET TO THE END OF THE CURVE; THENCE NORTH 19° 26' 10" EAST AND TANGENT TO THE LAST MENTIONED CURVE AT ITS POINT OF ENDING A DISTANCE OF 20.00 FEET TO THE POINT OF BEGINNING OF A CURVE, WHICH IS TANGENT AT ITS POINT OF BEGINNING TO THE LAST MENTIONED COURSE; THENCE NORTHEASTERLY ON THE ARC OF THE CURVE, WHICH IS CONCAVE TO THE SOUTHEAST AND OF RADIUS OF 55 00 FEET, A DISTANCE OF 16.72 FEET TO THE END OF THE CURVE; THENCE NORTH 36° 56' 10" EAST AND TANGENT TO THE LAST MENTIONED CURVE AT ITS POINT OF ENDING, A DISTANCE OF 21 00 FEET TO THE POINT OF BEGINNING OF A CURVE, WHICH IS TANGENT AT ITS POINT OF ENDING TO THE LAST MENTIONED COURSE; THENCE NORTHEASTERLY ON THE ARC OF THE CURVE, WHICH IS CONCAVE TO THE NORTHWEST AND OF RADIUS OF 133 76 FEET, A DISTANCE OF 5.00 FEET TO A POINT THROUGH WHICH A TANGENT TO THE CURVE BEARS NORTH 36° 47' 40" EAST; THENCE SOUTH 53° 58' 10" EAST A DISTANCE OF 75 93 FEET, MORE OR LESS, TO A POINT, THE MOST NORTHERLY CORNER OF LOT 10 IN THE NORTHWESTERLY BOUNDARY OF LOT 10 OF AFORESAID TRACT NO. 6472; THENCE FOLLOWING THE NORTHWESTERLY BOUNDARY LINE

*** LEGAL DESCRIPTION CONTINUED ***

04 0525305

3

OF SAID LOT 10 AND THE NORTHEASTERLY BOUNDARY LINE OF SAID LOT 9, SOUTH 55° 48' 40" WEST A DISTANCE OF 79 51 FEET TO THE NORTHEAST CORNER OF SAID LOT 9; THENCE NORTH 59° 53' 50" WEST A DISTANCE OF 39.50 FEET TO THE POINT OF BEGINNING.

PARCEL 3.

THAT PORTION OF LOT "C" OF CIELO VISTA TERRACE, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 83, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST EASTERLY NORTHEAST CORNER OF SAID LOT; THENCE ALONG THE EASTERLY LINE OF SAID LOT, SOUTH 5° 32' 13" WEST 123 40 FEET; THENCE NORTH 85° 44' 35" WEST 121.27 FEET; THENCE NORTH 4° 15' 25" EAST 77.37 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE WEST AND HAVING A RADIUS OF 324 43 FEET; THENCE NORTHERLY ALONG SAID CURVE 63.69 FEET TO A POINT IN THE NORTHEASTERLY LINE OF SAID LOT, A RADIAL LINE OF SAID CURVE TO SAID POINT BEARS NORTH 83° 00' 31" EAST; THENCE ALONG SAID NORTHEASTERLY LINE, SOUTH 78° 11' 00" EAST 131 40 FEET TO THE POINT OF BEGINNING.

EXCEPT THAT PORTION OF SAID LOT CONVEYED TO THE CITY OF LOS ANGELES, BY DEED RECORDED ON FEBRUARY 10, 1926 AS INSTRUMENT NO. 1754, IN BOOK 5579, PAGE 217, OF OFFICIAL RECORDS OF SAID COUNTY.

PARCEL 4.

THOSE PORTIONS OF "C" AND "E" OF CIELO VISTA TERRACE, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 83, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS A WHOLE AS FOLLOWS.

BEGINNING AT THE MOST SOUTHERLY CORNER OF SAID LOT "C" BEING ALSO THE MOST EASTERLY CORNER OF SAID LOT "E", THENCE ALONG THE EASTERLY LINE OF SAID LOT "E", SOUTH 28° 00' 00" WEST 84 30 FEET TO THE MOST EASTERLY CORNER OF TRACT NO. 7325, AS PER MAP RECORDED IN BOOK 129, PAGE 84 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, THENCE ALONG THE NORTHEASTERLY LINE OF SAID TRACT NO 7325, NORTH 49° 56' 10" WEST 117 60 FEET; THENCE NORTH 28° 00' 00" EAST 17.02 FEET; THENCE NORTH 5° 32' 20" EAST 58 43 FEET; THENCE NORTH 0° 26' 10" WEST 12.38 FEET; THENCE NORTH 89° 33' 50" EAST 119 12 FEET TO THE EASTERLY LINE OF SAID LOT "C", THENCE SOUTHERLY ALONG THE EASTERLY LINE OF SAID LOT "C", A DISTANCE OF 116.15 FEET TO THE POINT OF BEGINNING

EXCEPT THAT PORTION OF SAID LOTS CONVEYED TO THE CITY OF LOS ANGELES, BY DEED RECORDED ON FEBRUARY 10, 1926 AS INSTRUMENT NO. 1754, IN BOOK 5579, PAGE 217, OF OFFICIAL RECORDS OF SAID COUNTY.

PARCEL 5

THAT PORTION OF LOT "C" OF CIELO VISTA TERRACE, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 83, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

*** LEGAL DESCRIPTION CONTINUED ***

04 0525305

4

BEGINNING AT THE NORTHWEST CORNER OF THE LAND DESCRIBED AS PARCEL 2 IN DEED TO MAHLON M. DELP, RECORDED IN BOOK 29805, PAGE 41 OF OFFICIAL RECORDS OF SAID COUNTY, THENCE NORTH 0° 26' 10" WEST 23.82 FEET TO THE BEGINNING OF A CURVE CONCAVE EAST AND HAVING A RADIUS OF 224.09 FEET; THENCE NORTHERLY ALONG SAID CURVE 18 29 FEET, THENCE NORTHERLY IN A DIRECT LINE TO THE SOUTHWEST CORNER OF LAND DESCRIBED AS PARCEL 1 IN THE ABOVE MENTIONED DEED TO MAHLON M. DELP, THENCE ALONG THE SOUTHERLY LINE OF SAID PARCEL 1, SOUTH 85° 45' 30" EAST, A DISTANCE OF 121.27 FEET TO THE SOUTHEAST CORNER OF SAID PARCEL 1, THENCE SOUTHERLY IN A DIRECT LINE TO THE NORTHEAST CORNER OF THE LAND DESCRIBED AS PARCEL 2 IN SAID DEED TO MAHLON M. DELP; THENCE SOUTH 89° 33' 50" WEST ALONG THE NORTHERLY LINE OF SAID PARCEL 2, A DISTANCE OF 119.12 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM THAT PORTION CONVEYED TO THE CITY OF LOS ANGELES, BY DEED RECORDED IN BOOK 8579, PAGE 217, OF OFFICIAL RECORDS OF SAID COUNTY.

PARCEL 6.

THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 8, TOWNSHIP 1 SOUTH, RANGE 14 WEST SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF THE SURVEY OF SAID LAND ON FILE IN THE BUREAU OF LAND MANAGEMENT, DESCRIBED AS FOLLOWS·

BEGINNING AT THE SOUTHEAST CORNER OF LOT 9 IN BLOCK 51 OF TRACT NO. 2019, AS PER MAP RECORDED IN BOOK 22, PAGES 126 AND 127 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, THENCE NORTH 89° 43' 30" EAST ALONG THE EAST PROLONGATION OF THE SOUTH LINE OF SAID LOT 9, A DISTANCE OF 10 04 FEET TO A POINT IN THE WEST BOUNDARY OF LAUREL CANYON ROAD, 40 FEET WIDE, THENCE SOUTH 4° 01' 15" WEST ALONG SAID WEST BOUNDARY, A DISTANCE OF 20.75 FEET; THENCE SOUTHERLY ALONG A CURVE CONCAVE TO THE EAST, TANGENT AT ITS POINT OF BEGINNING TO THE LAST MENTIONED COURSE, AND HAVING A RADIUS OF 120 FEET, A DISTANCE OF 99 93 FEET; THENCE SOUTH 43° 42' 15" EAST AND TANGENT TO SAID LAST MENTIONED CURVE AT ITS POINT OF ENDING, A DISTANCE OF 214 35 FEET, THENCE CONTINUING SOUTHEASTERLY ALONG SAID BOUNDARY, THE SAME BEING A CURVE CONCAVE TO THE SOUTHWEST, TANGENT AT ITS POINT OF BEGINNING TO THE LAST MENTIONED COURSE, SAID HAVING A RADIUS OF 280 FEET, A DISTANCE OF 85 78 FEET; THENCE NORTH 88° 07' 25" WEST, A DISTANCE OF 35.30 FEET; THENCE SOUTHERLY ALONG A CURVE CONCAVE TO THE WEST, TANGENT AT ITS POINT OF BEGINNING TO A LINE BEARING SOUTH 2° 10' 40" WEST, AND HAVING A RADIUS OF 105 FEET, A DISTANCE OF 52.02 FEET; WHERE A TANGENCY TO SAID CURVE BEARS SOUTH 30° 17' 45" WEST; THENCE SOUTH 59° 57' 30" EAST, A DISTANCE OF 65 FEET TO THE NORTHWEST CORNER OF THAT CERTAIN PARCEL OF LAND CONVEYED TO FIDEL LA BARBA, BY DEED RECORDED IN BOOK 6070, PAGE 55 OF OFFICIAL RECORDS; THENCE SOUTH 12° 51' 00" EAST ALONG THE WESTERLY LINE AND ITS PROLONGATION SOUTHERLY OF SAID PARCEL, A DISTANCE OF 410.22 FEET; THENCE SOUTHEASTERLY ALONG A CURVE CONCAVE TO THE NORTHEAST, TANGENT AT ITS POINT OF BEGINNING TO THE LAST MENTIONED COURSE, AND HAVING A RADIUS OF 595 FEET, A DISTANCE OF 11.19 FEET, WHERE A TANGENCY TO SAID CURVE BEARS SOUTH 13° 55' 40" EAST; THENCE NORTH 76° 04' 20" EAST, A DISTANCE OF 75 FEET TO A POINT IN THE WEST LINE OF SAID LAUREL CANYON ROAD; THENCE SOUTHEASTERLY ALONG THE WEST BOUNDARY OF LAUREL CANYON ROAD, THE SAME BEING A CURVE CONCAVE TO THE EAST, TANGENT AT ITS POINT OF BEGINNING TO A LINE BEARING SOUTH 13° 55' 40" EAST AND HAVING A RADIUS OF 520 FEET, A DISTANCE OF 35.90 FEET; THENCE ALONG THE WESTERLY BOUNDARY OF LAUREL CANYON ROAD, AS DESCRIBED IN DEED RECORDED IN BOOK 8579, PAGE 217 OF

*** LEGAL DESCRIPTION CONTINUED ***

04 0525305
6

3/5/04

ORDER NO. LA0430179

OFFICIAL RECORDS OF SAID COUNTY, SOUTH 17° 53' 00" EAST AND TANGENT TO SAID LAST MENTIONED CURVE, AT ITS POINT OF ENDING, A DISTANCE OF 153.60 FEET; THENCE CONTINUING SOUTHERLY ALONG THE WESTERLY BOUNDARY OF LAUREL CANYON ROAD AND HOLLYWOOD BOULEVARD, THE SAME BEING A CURVE CONCAVE TO THE WEST, TANGENT AT ITS POINT OF BEGINNING TO THE LAST MENTIONED COURSE, AND HAVING A RADIUS OF 439.43 FEET TO THE NORTHERLY LINE OF LOT "C" OF CIELO VISTA TERRACE, SHEET NO. 2, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE IN A GENERAL WESTERLY AND NORTHWESTERLY DIRECTION ALONG THE NORTHERLY LINE OF CIELO VISTA TERRACE SHEET NO. 2, FOLLOWING THE SAME IN ALL ITS VARIOUS COURSES AND DISTANCES TO THE NORTHWESTERLY CORNER OF LOT "A", SAID CIELO VISTA TERRACE SHEET NO. 2; THENCE NORTHERLY ALONG THE NORTHERLY PROLONGATION OF THE WESTERLY LINE OF SAID LOT "A" TO A POINT IN THE NORTH LINE 952.66 FEET TO THE POINT OF BEGINNING

EXCEPT THEREFROM THAT PORTION OF SAID LAND DESCRIED IN THE DEED FROM FRED RICHARD SALTER TO VIRGINIA LOUISE SALTER, RECORDED ON NOVEMBER 5, 1935, IN BOOK 13755, PAGE 259 OF OFFICIAL RECORDS OF SAID COUNTY

PARCEL 7:

LOT "A" OF TRACT NO. 7325, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 129, PAGE 84 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY

PARCEL 8:

AN EASEMENT FOR INGRESS AND EGRESS AND LANDSCAPING, WALLS, PLANTERS AND IRRIGATION PURPOSES OVER THAT PORTION OF LOT "C", CIELO VISTA TERRACE, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

COMMENCING AT THE MOST NORTHERLY CORNER OF THAT PARCEL OF LAND DESCRIBED IN DEED RECORDED IN BOOK 5649, PAGE 134, OFFICIAL RECORDS; THENCE SOUTHERLY ALONG THE WESTERLY LINE OF SAID LAND, SAID WESTERLY LINE BEING A CURVE CONCAVE TO THE NORTHWEST, HAVING A RADIUS OF 133.76 FEET, A DISTANCE OF 6.00 FEET; THENCE SOUTH 39° 56' 10" WEST A DISTANCE OF 21.00 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 55.00 FEET; THENCE SOUTHERLY ALONG SAID CURVE, A DISTANCE OF 5.93 FEET THROUGH A CENTRAL ANGLE OF 6° 10' 29" TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING SOUTHERLY ALONG SAID CURVE A DISTANCE OF 3.53 FEET THROUGH A CENTRAL ANGLE OF 3° 40' 48" TO THE BEGINNING OF A CURVE CONCAVE TO THE SOUTHWEST HAVING A RADIUS OF 90.23 FEET, A RADIAL LINE HAVING A BEARING OF NORTH 76° 37' 01" WEST; THENCE NORTHERLY ALONG SAID CURVE A DISTANCE OF 3.00 FEET THROUGH A CENTRAL ANGLE OF 1° 54' 18", THENCE NORTH 86° 48' 07" EAST 1.22 FEET TO THE TRUE POINT OF BEGINNING.

04 0525305



**This page is part of your document - DO NOT DISCARD**



**04 0525307**

**RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA
03/05/04 AT 08:00am**

## TITLE(S) :

**L E A D   S H E E T**

| FEE | FEE $94.00 JJ | | D.T.T |
| | DAF $20 | |
| | C-20 | 30 |

**CODE
20**

**CODE
19**

**CODE
9____**

**Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.**        **Number of AIN's Shown**



**THIS FORM NOT TO BE DUPLICATED**

3/5/04

2

After Recording Return To:

FIRST CAPITAL                                          04 0525307

1401 OCEAN AVENUE
SUITE 210
SANTA MONICA, CALIFORNIA 90401
LOAN NO.   3439730

ESCROW NO : 25235-JM
TITLE NO.  LA0430179
PARCEL NO.

_____ |SPACE ABOVE THIS LINE FOR RECORDING DATA]——

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in  Sections 3, 11, 13, 18, 20 and 21   Certain rules regarding the usage of words used in this document are  also  provided  in Section 16

(A) "Security Instrument" means this document, which is dated FEBRUARY   19   ,  2004   , together with all Riders to this document

(B) "Borrower" is
DANIEL S LAIKIN, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY
_____
_____
_____

Borrower is the trustor under this Security Instrument

(C) "Lender" is
FIRST CAPITAL, A CALIFORNIA CORPORATION

Lender is  A CALIFORNIA CORPORATION                          organized and existing under the laws
of          CALIFORNIA                               . Lender's address is
1401 OCEAN AVENUE SUITE 210, SANTA MONICA, CALIFORNIA 90401
_____ Lender is the beneficiary under this Security Instrument

(D) "Trustee" is
EQUITY TITLE COMPANY

(E) "Note" means the promissory note signed by Borrower and dated FEBRUARY   19   ,   2004   The Note states that Borrower owes Lender
TWO MILLION NINE HUNDRED TWENTY FIVE THOUSAND AND 00/100
(U S $      2,925,000.00     ) plus interest  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than MARCH   01  ,  2034

Initials XXL

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
DOCPREP SERVICES INC  FORM  DOTCAI-3005                                    Form 3005  1/01
                                          Page 1 of 15
                                           ORIGINAL

3/5/04

4

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the __COUNTY__

of  __LOS ANGELES__

[Name of Recording Jurisdiction]                                         [Type of Recording Jurisdiction]

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

# SEE EXHIBIT A

ADJUSTABLE RATE RIDER(S) ATTACHED HERETO AND MADE A PART HEREOF

EXHIBIT "B" ATTACHED HERETO AND MADE A PART HEREOF

PARCEL NO ·

which currently has the address of  __8159 HOLLYWOOD BOULEVARD__

__LOS ANGELES__                                                                [Street]

[City/Area]                          , California    __90069__          ("Property Address")

[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property  All replacements and additions shall also be covered by this Security Instrument  All of the foregoing is referred to in this Security Instrument as the "Property "

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property

LOAN NO.:  3439730

Initials _____

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Docprep Services Inc  FORM - DOTCA1-3005

Page 3 of 15

Form 3005 1/01

ORIGINAL

## 04 0525307

10-50494-pmc    Doc 101    FILED 04/09/10    ENTERED 04/09/10 17:08:40    Page 65 of 85

3/5/04

15

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**BY SIGNING BELOW,** Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses

_____          _____(Seal)
                                    DANIEL S. LAIKIN                -Borrower

_____          _____(Seal)
                                                                   -Borrower

                                   _____(Seal)
                                                                   -Borrower

                                   _____(Seal)
                                                                   -Borrower

                                   _____(Seal)
                                                                   -Borrower

                                   _____(Seal)
                                                                   -Borrower

LOAN NO.: 3439730

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3005 1/01
DOCPREP SERVICES INC: FORM DOTCA1.3005
                                    Page 14 of 15
                                    ORIGINAL

04 0525307

3/5/04

16

[Space Below This Line For Acknowledgment]

STATE OF CALIFORNIA
COUNTY OF *Los Angeles*                    } SS

On *Feb. 20, 2004* before me, *Xochitl Barron Notary Public* personally appeared,
DANIEL S. LAIKIN
                                                    (Notary Name and Title)

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or
or the entity upon behalf of which the person(s) acted, executed the instrument

WITNESS my hand and official seal

Signature *Xochitl Barron*

(Notarial Seal)

XOCHITL BARRON
Commission # 1346617
Notary Public - California
Los Angeles County
My Comm. Expires Mar 15, 2006

LOAN NO.: 3439730

## REQUEST FOR RECONVEYANCE

TO TRUSTEE.

The undersigned is the holder of the note or notes secured by this Deed of Trust. Said note or notes,
together with all other indebtedness secured by this Deed of Trust, have been paid in full. You are hereby
directed to cancel said note or notes and this Deed of Trust, which are delivered hereby, and to reconvey,
without warranty, all the estate now held by you under this Deed of Trust to the person or persons legally
entitled thereto

Dated _____

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT         Form 3005 1/01
*Docprep Services Inc Form DOTCA1-9005*                    Page 15 of 15
                                          ORIGINAL.

## 04 0525307

icription: Los Angeles CA Document

3/5/04

*17*

FIRST CAPITAL

1401 OCEAN AVENUE
SUITE 210
SANTA MONICA, CALIFORNIA 90401
APN #
LOAN NO :   3439730
ESCROW # 25295-JM
TITLE ORDER # LA0430179

——————— [SPACE ABOVE RESERVED FOR RECORDER] ———————

ATTACHED TO DEED OF TRUST / MORTGAGE DATED:   FEBRUARY   19, 2004

Loan No   3439730

Property Address

8159 HOLLYWOOD BOULEVARD; LOS ANGELES, CALIFORNIA 90069

## EXHIBIT A

### LEGAL DESCRIPTION

DOCPREP SERVICES INC FORM EXHIBITA-0005

Initials

ORIGINAL

## 04 0525307

cription: Los Angeles ...

3/5/04

ORDER NO LA0430179

18

**EXHIBIT "A"**

**PARCEL 1:**

A PORTION OF LOT 9 OF TRACT NO. 6472, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 75, PAGES 22 AND 23 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY CORNER OF SAID LOT 9, WHICH CORNER IS A POINT IN THE EASTERLY BOUNDARY LINE OF LAUREL VIEW DRIVE, AND IS A POINT COMPOUND CURVATURE THROUGH WHICH POINT A TANGENT TO THE CURVE BEARS NORTH 30° 08' 10" EAST; THENCE SOUTHWESTERLY ON THE ARC OF A CURVE CONCAVE TO THE NORTHWEST AND OF RADIUS OF 151.50 FEET, A DISTANCE OF 31.07 FEET TO A POINT OF COMPOUND CURVATURE, THROUGH WHICH A TANGENT TO THE CURVE BEARS SOUTH 41° 51' 10" WEST; THENCE SOUTH 49° 04' 00" EAST, A DISTANCE OF 73.69 FEET, MORE OR LESS, TO A POINT IN THE EASTERLY BOUNDARY LINE OF SAID LOT 9, WHICH POINT IS AT THE END OF A CURVE CONCAVE TO THE NORTHWEST, AND OF RADIUS OF 14.92 FEET; THENCE FOLLOWING THE EASTERLY AND NORTHEASTERLY BOUNDARY OF SAID LOT 9, NORTH 3° 30' 25" WEST, AND TANGENT TO THE LAST MENTIONED CURVE AT ITS POINT OF ENDING, A DISTANCE OF 59.66 FEET TO THE NORTHEAST CORNER OF SAID LOT 9; THENCE NORTH 59° 53' 50" WEST; A DISTANCE OF 39.50 FEET TO THE POINT OF BEGINNING.

**PARCEL 2:**

A PORTION OF LOTS "C" AND "E" OF CIELO VISTA TERRACE, SHEET 2, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY CORNER OF LOT 9 OF SAID TRACT NO. 6472, WHICH CORNER IS A POINT IN THE EASTERLY BOUNDARY LINE OF LAUREL VIEW DRIVE, AND IS A POINT OF COMPOUND CURVATURE THROUGH WHICH A TANGENT TO THE CURVE BEARS NORTH 30° 08' 10" EAST; THENCE NORTHEASTERLY ON THE ARC OF A CURVE CONCAVE TO THE NORTHWEST AND OF RADIUS OF 84.00 FEET, A DISTANCE OF 15.84 FEET TO THE END OF THE CURVE; THENCE NORTH 19° 26' 10" EAST AND TANGENT TO THE LAST MENTIONED CURVE AT ITS POINT OF ENDING A DISTANCE OF 20.00 FEET TO THE POINT OF BEGINNING OF A CURVE, WHICH IS TANGENT AT ITS POINT OF BEGINNING TO THE LAST MENTIONED COURSE; THENCE NORTHEASTERLY ON THE ARC OF THE CURVE, WHICH IS CONCAVE TO THE SOUTHEAST AND OF RADIUS OF 53.00 FEET, A DISTANCE OF 16.72 FEET TO THE END OF THE CURVE; THENCE NORTH 38° 56' 10" EAST AND TANGENT TO THE LAST MENTIONED CURVE AT ITS POINT OF ENDING, A DISTANCE OF 21.00 FEET TO THE POINT OF BEGINNING OF A CURVE, WHICH IS TANGENT AT ITS POINT OF ENDING TO THE LAST MENTIONED COURSE; THENCE NORTHEASTERLY ON THE ARC OF THE CURVE, WHICH IS CONCAVE TO THE NORTHWEST AND OF RADIUS OF 133.76 FEET, A DISTANCE OF 5.00 FEET TO A POINT THROUGH WHICH A TANGENT TO THE CURVE BEARS NORTH 36° 47' 40" EAST; THENCE SOUTH 53° 56' 10" EAST A DISTANCE OF 78.93 FEET, MORE OR LESS, TO A POINT, THE MOST NORTHERLY CORNER OF LOT 10 IN THE NORTHWESTERLY BOUNDARY OF LOT 10 OF AFORESAID TRACT NO. 6472; THENCE FOLLOWING THE NORTHWESTERLY BOUNDARY LINE

**\*\*\* LEGAL DESCRIPTION CONTINUED \*\*\***

**04 0525307**

:scription: Los Angeles ...

3/5/04

19

OF SAID LOT 10 AND THE NORTHEASTERLY BOUNDARY LINE OF SAID LOT 9, SOUTH 55° 48' 40" WEST A DISTANCE OF 79.51 FEET TO THE NORTHEAST CORNER OF SAID LOT 9; THENCE NORTH 59° 53' 50" WEST A DISTANCE OF 39.50 FEET TO THE POINT OF BEGINNING.

PARCEL 3:

THAT PORTION OF LOT "C" OF CIELO VISTA TERRACE, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST EASTERLY NORTHEAST CORNER OF SAID LOT; THENCE ALONG THE EASTERLY LINE OF SAID LOT, SOUTH 5° 32' 13" WEST 123.40 FEET; THENCE NORTH 65° 44' 35" WEST 121.27 FEET; THENCE NORTH 4° 15' 25" EAST 77.37 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE WEST AND HAVING A RADIUS OF 324.43 FEET, THENCE NORTHERLY ALONG SAID CURVE 63.69 FEET TO A POINT IN THE NORTHEASTERLY LINE OF SAID LOT, A RADIAL LINE OF SAID CURVE TO SAID POINT BEARS NORTH 83° 00' 31" EAST; THENCE ALONG SAID NORTHEASTERLY LINE, SOUTH 78° 11' 00" EAST 131.40 FEET TO THE POINT OF BEGINNING

EXCEPT THAT PORTION OF SAID LOT CONVEYED TO THE CITY OF LOS ANGELES, BY DEED RECORDED ON FEBRUARY 10, 1926 AS INSTRUMENT NO. 1754, IN BOOK 5579, PAGE 217, OF OFFICIAL RECORDS OF SAID COUNTY.

PARCEL 4:

THOSE PORTIONS OF "C" AND "E" OF CIELO VISTA TERRACE, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS A WHOLE AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF SAID LOT "C" BEING ALSO THE MOST EASTERLY CORNER OF SAID LOT "E"; THENCE ALONG THE EASTERLY LINE OF SAID LOT "E", SOUTH 28° 00' 00" WEST 54.30 FEET TO THE MOST EASTERLY CORNER OF TRACT NO. 7325, AS PER MAP RECORDED IN BOOK 129, PAGE 84 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE ALONG THE NORTHEASTERLY LINE OF SAID TRACT NO. 7325, NORTH 49° 56' 10" WEST 117.60 FEET; THENCE NORTH 28° 00' 00" EAST 17.02 FEET, THENCE NORTH 5° 32' 20" EAST 58.43 FEET; THENCE NORTH 0° 26' 10" WEST 12.38 FEET; THENCE NORTH 89° 33' 50" EAST 119 12 FEET TO THE EASTERLY LINE OF SAID LOT "C"; THENCE SOUTHERLY ALONG THE EASTERLY LINE OF SAID LOT "C", A DISTANCE OF 116.15 FEET TO THE POINT OF BEGINNING.

EXCEPT THAT PORTION OF SAID LOTS CONVEYED TO THE CITY OF LOS ANGELES, BY DEED RECORDED ON FEBRUARY 10, 1926 AS INSTRUMENT NO. 1754, IN BOOK 5579, PAGE 217, OF OFFICIAL RECORDS OF SAID COUNTY.

PARCEL 5:

THAT PORTION OF LOT "C" OF CIELO VISTA TERRACE, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

*** LEGAL DESCRIPTION CONTINUED ***

04 0525307

scription: Los Angeles,CA Document-Year.DocID 2004 525307 -

3/5/04

20

ORDER NO LA0430179

BEGINNING AT THE NORTHWEST CORNER OF THE LAND DESCRIBED AS PARCEL 2 IN DEED
TO MAHLON M. DELP, RECORDED IN BOOK 29805, PAGE 41 OF OFFICIAL RECORDS OF SAID
COUNTY; THENCE NORTH 0° 26' 10" WEST 23.82 FEET TO THE BEGINNING OF A CURVE
CONCAVE EAST AND HAVING A RADIUS OF 224.09 FEET; THENCE NORTHERLY ALONG SAID
CURVE 18.39 FEET; THENCE NORTHERLY IN A DIRECT LINE TO THE SOUTHWEST CORNER OF
LAND DESCRIBED AS PARCEL 1 IN THE ABOVE MENTIONED DEED TO MAHLON M. DELP;
THENCE ALONG THE SOUTHERLY LINE OF SAID PARCEL 1, SOUTH 85° 45' 30" EAST, A
DISTANCE OF 121.27 FEET TO THE SOUTHEAST CORNER OF SAID PARCEL 1; THENCE
SOUTHERLY IN A DIRECT LINE TO THE NORTHEAST CORNER OF THE LAND DESCRIBED AS
PARCEL 2 IN SAID DEED TO MAHLON M. DELP, THENCE SOUTH 89° 33' 50" WEST ALONG THE
NORTHERLY LINE OF SAID PARCEL 2, A DISTANCE OF 119.12 FEET TO THE POINT OF
BEGINNING .

EXCEPT THEREFROM THAT PORTION CONVEYED TO THE CITY OF LOS ANGELES, BY DEED
RECORDED IN BOOK 5570, PAGE 217, OF OFFICIAL RECORDS OF SAID COUNTY.

PARCEL 6:

THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 8, TOWNSHIP 1 SOUTH, RANGE 14
WEST SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES, COUNTY OF LOS
ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF THE SURVEY OF
SAID LAND ON FILE IN THE BUREAU OF LAND MANAGEMENT, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF LOT 9 IN BLOCK 51 OF TRACT NO. 2019, AS PER
MAP RECORDED IN BOOK 22, PAGES 126 AND 127 OF MAPS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY; THENCE NORTH 88° 43' 30" EAST ALONG THE EAST
PROLONGATION OF THE SOUTH LINE OF SAID LOT 9, A DISTANCE OF 10.04 FEET TO A POINT
IN THE WEST BOUNDARY OF LAUREL CANYON ROAD, 40 FEET WIDE; THENCE SOUTH 4° 01'
15" WEST ALONG SAID WEST BOUNDARY, A DISTANCE OF 20.79 FEET; THENCE SOUTHERLY
ALONG A CURVE CONCAVE TO THE EAST, TANGENT AT ITS POINT OF BEGINNING TO THE
LAST MENTIONED COURSE, AND HAVING A RADIUS OF 120 FEET, A DISTANCE OF 99.95 FEET;
THENCE SOUTH 43° 42' 15" EAST AND TANGENT TO SAID LAST MENTIONED CURVE AT ITS
POINT OF ENDING, A DISTANCE OF 214.35 FEET; THENCE CONTINUING SOUTHEASTERLY
ALONG SAID BOUNDARY, THE SAME BEING A CURVE CONCAVE TO THE SOUTHWEST,
TANGENT AT ITS POINT OF BEGINNING TO THE LAST MENTIONED COURSE, SAID HAVING A
RADIUS OF 280 FEET, A DISTANCE OF 95.78 FEET; THENCE NORTH 88° 07' 25" WEST, A
DISTANCE OF 35.30 FEET; THENCE SOUTHERLY ALONG A CURVE CONCAVE TO THE WEST,
TANGENT AT ITS POINT OF BEGINNING TO A LINE BEARING SOUTH 2° 10' 40" WEST, AND
HAVING A RADIUS OF 105 FEET, A DISTANCE OF 52.02 FEET; WHERE A TANGENCY TO SAID
CURVE BEARS SOUTH 30° 17' 45" WEST; THENCE SOUTH 59° 57' 30" EAST, A DISTANCE OF 65
FEET TO THE NORTHWEST CORNER OF THAT CERTAIN PARCEL OF LAND CONVEYED TO
FIDEL LA BARBA, BY DEED RECORDED IN BOOK 6070, PAGE 55 OF OFFICIAL RECORDS;
THENCE SOUTH 12° 51' 00" EAST ALONG THE WESTERLY LINE AND ITS PROLONGATION
SOUTHERLY OF SAID PARCEL, A DISTANCE OF 410.22 FEET; THENCE SOUTHEASTERLY
ALONG A CURVE CONCAVE TO THE NORTHEAST, TANGENT AT ITS POINT OF BEGINNING TO
THE LAST MENTIONED COURSE, AND HAVING A RADIUS OF 598 FEET, A DISTANCE OF 11.19
FEET, WHERE A TANGENCY TO SAID CURVE BEARS SOUTH 13° 59' 40" EAST, THENCE NORTH
76° 04' 20" EAST, A DISTANCE OF 75 FEET TO A POINT IN THE WEST LINE OF SAID LAUREL
CANYON ROAD; THENCE SOUTHEASTERLY ALONG THE WEST BOUNDARY OF LAUREL
CANYON ROAD, THE SAME BEING A CURVE CONCAVE TO THE EAST, TANGENT AT ITS POINT
OF BEGINNING TO A LINE BEARING SOUTH 13° 55' 40" EAST AND HAVING A RADIUS OF 520
FEET, A DISTANCE OF 35.90 FEET; THENCE ALONG THE WESTERLY BOUNDARY OF LAUREL
CANYON ROAD, AS DESCRIBED IN DEED RECORDED IN BOOK 5570, PAGE 217 OF

*** LEGAL DESCRIPTION CONTINUED ***

04 0525307

scription: Los Angeles CA Document-Year.DocID 2004 525307 Page: 20 of 31

3/5/04

21

OFFICIAL RECORDS OF SAID COUNTY; SOUTH 17° 53' 00" EAST AND TANGENT TO SAID LAST MENTIONED CURVE, AT ITS POINT OF ENDING, A DISTANCE OF 153.88 FEET, THENCE CONTINUING SOUTHERLY ALONG THE WESTERLY BOUNDARY OF LAUREL CANYON ROAD AND HOLLYWOOD BOULEVARD, THE SAME BEING A CURVE CONCAVE TO THE WEST, TANGENT AT ITS POINT OF BEGINNING TO THE LAST MENTIONED COURSE, AND HAVING A RADIUS OF 439.43 FEET TO THE NORTHERLY LINE OF LOT "C" OF CIELO VISTA TERRACE, SHEET NO. 2, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE IN A GENERAL WESTERLY AND NORTHWESTERLY DIRECTION ALONG THE NORTHERLY LINE OF CIELO VISTA TERRACE SHEET NO. 2, FOLLOWING THE SAME IN ALL ITS VARIOUS COURSES AND DISTANCES TO THE NORTHWESTERLY CORNER OF LOT "A", SAID CIELO VISTA TERRACE SHEET NO. 2; THENCE NORTHERLY ALONG THE NORTHERLY PROLONGATION OF THE WESTERLY LINE OF SAID LOT "A" TO A POINT IN THE NORTH LINE 952.56 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM THAT PORTION OF SAID LAND DESCRIED IN THE DEED FROM FRED RICHARD SALTER TO VIRGINIA LOUISE SALTER, RECORDED ON NOVEMBER 5, 1935, IN BOOK 13755, PAGE 259 OF OFFICIAL RECORDS OF SAID COUNTY.

PARCEL 7:

LOT "A" OF TRACT NO. 7325, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 129, PAGE 54 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 8:

AN EASEMENT FOR INGRESS AND EGRESS AND LANDSCAPING, WALLS, PLANTERS AND IRRIGATION PURPOSES OVER THAT PORTION OF LOT "C", CIELO VISTA TERRACE, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS.

COMMENCING AT THE MOST NORTHERLY CORNER OF THAT PARCEL OF LAND DESCRIBED IN DEED RECORDED IN BOOK 5649, PAGE 134, OFFICIAL RECORDS; THENCE SOUTHERLY ALONG THE WESTERLY LINE OF SAID LAND, SAID WESTERLY LINE BEING A CURVE CONCAVE TO THE NORTHWEST, HAVING A RADIUS OF 133.76 FEET, A DISTANCE OF 9.00 FEET; THENCE SOUTH 39° 58' 10" WEST A DISTANCE OF 21.00 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 65.00 FEET; THENCE SOUTHERLY ALONG SAID CURVE, A DISTANCE OF 5.93 FEET THROUGH A CENTRAL ANGLE OF 6° 10' 29" TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING SOUTHERLY ALONG SAID CURVE A DISTANCE OF 3.53 FEET THROUGH A CENTRAL ANGLE OF 3° 40' 45" TO THE BEGINNING OF A CURVE CONCAVE TO THE SOUTHWEST HAVING A RADIUS OF 90.23 FEET, A RADIAL LINE HAVING A BEARING OF NORTH 76° 37' 01" WEST; THENCE NORTHERLY ALONG SAID CURVE A DISTANCE OF 3.00 FEET THROUGH A CENTRAL ANGLE OF 1° 54' 16", THENCE NORTH 86° 45' 07" EAST 1.22 FEET TO THE TRUE POINT OF BEGINNING.

04 0525307

3/5/04

*22*

# EXHIBIT "B"

**Parcel Numbers for 8159 Hollywood Boulevard**
**Los Angeles, California 90069**

**5556-028-019**
**5556-028-014**
**5556-028-011**
**5556-028-013**
**5556-028-012**
**5556-007-007**
**5556-028-016**

# 04 0525307

3/5/04

23

ORDER NO. LA0430179

## EXHIBIT "A"

**PARCEL 1:**

A PORTION OF LOT 9 OF TRACT NO. 6472, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 75, PAGES 22 AND 23 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY CORNER OF SAID LOT 9, WHICH CORNER IS A POINT IN THE EASTERLY BOUNDARY LINE OF LAUREL VIEW DRIVE, AND IS A POINT COMPOUND CURVATURE THROUGH WHICH POINT A TANGENT TO THE CURVE BEARS NORTH 30° 06' 10" EAST; THENCE SOUTHWESTERLY ON THE ARC OF A CURVE CONCAVE TO THE NORTHWEST AND OF RADIUS OF 151.50 FEET, A DISTANCE OF 31.07 FEET TO A POINT OF COMPOUND CURVATURE, THROUGH WHICH A TANGENT TO THE CURVE BEARS SOUTH 41° 51' 10" WEST; THENCE SOUTH 49° 04' 00" EAST, A DISTANCE OF 73.69 FEET, MORE OR LESS, TO A POINT IN THE EASTERLY BOUNDARY LINE OF SAID LOT 9, WHICH POINT IS AT THE END OF A CURVE CONCAVE TO THE NORTHWEST, AND OF RADIUS OF 14.92 FEET; THENCE FOLLOWING THE EASTERLY AND NORTHEASTERLY BOUNDARY OF SAID LOT 9, NORTH 3° 30' 25" WEST, AND TANGENT TO THE LAST MENTIONED CURVE AT ITS POINT OF ENDING, A DISTANCE OF 53.66 FEET TO THE NORTHEAST CORNER OF SAID LOT 9; THENCE NORTH 59° 53' 50" WEST, A DISTANCE OF 39.50 FEET TO THE POINT OF BEGINNING.

**PARCEL 2:**

A PORTION OF LOTS "C" AND "E" OF CIELO VISTA TERRACE, SHEET 2, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY CORNER OF LOT 9 OF SAID TRACT NO. 6472, WHICH CORNER IS A POINT IN THE EASTERLY BOUNDARY LINE OF LAUREL VIEW DRIVE, AND IS A POINT OF COMPOUND CURVATURE THROUGH WHICH A TANGENT TO THE CURVE BEARS NORTH 30° 06' 10" EAST; THENCE NORTHEASTERLY ON THE ARC OF A CURVE CONCAVE TO THE NORTHWEST AND OF RADIUS OF 84.00 FEET, A DISTANCE OF 16.64 FEET TO THE END OF THE CURVE; THENCE NORTH 19° 25' 10" EAST AND TANGENT TO THE LAST MENTIONED CURVE AT ITS POINT OF ENDING A DISTANCE OF 20.00 FEET TO THE POINT OF BEGINNING OF A CURVE, WHICH IS TANGENT AT ITS POINT OF BEGINNING TO THE LAST MENTIONED COURSE; THENCE NORTHEASTERLY ON THE ARC OF THE CURVE, WHICH IS CONCAVE TO THE SOUTHEAST AND OF RADIUS OF 55.00 FEET, A DISTANCE OF 18.72 FEET TO THE END OF THE CURVE; THENCE NORTH 38° 56' 10" EAST AND TANGENT TO THE LAST MENTIONED CURVE AT ITS POINT OF ENDING, A DISTANCE OF 21.00 FEET TO THE POINT OF BEGINNING OF A CURVE, WHICH IS TANGENT AT ITS POINT OF ENDING TO THE LAST MENTIONED COURSE; THENCE NORTHEASTERLY ON THE ARC OF THE CURVE, WHICH IS CONCAVE TO THE NORTHWEST AND OF RADIUS OF 133.76 FEET, A DISTANCE OF 5.00 FEET TO A POINT THROUGH WHICH A TANGENT TO THE CURVE BEARS NORTH 36° 47' 40" EAST; THENCE SOUTH 53° 56' 10" EAST A DISTANCE OF 75.93 FEET, MORE OR LESS, TO A POINT, THE MOST NORTHERLY CORNER OF LOT 10 IN THE NORTHWESTERLY BOUNDARY OF LOT 10 AFORESAID TRACT NO. 6472, THENCE FOLLOWING THE NORTHWESTERLY BOUNDARY LINE

*** LEGAL DESCRIPTION CONTINUED ***

04 0525307

3/5/04

24

OF SAID LOT 10 AND THE NORTHEASTERLY BOUNDARY LINE OF SAID LOT 9, SOUTH 55° 48' 40" WEST A DISTANCE OF 78.61 FEET TO THE NORTHEAST CORNER OF SAID LOT 9; THENCE NORTH 59° 53' 50" WEST A DISTANCE OF 39.50 FEET TO THE POINT OF BEGINNING.

**PARCEL 3:**

THAT PORTION OF LOT "C" OF CIELO VISTA TERRACE, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST EASTERLY NORTHEAST CORNER OF SAID LOT; THENCE ALONG THE EASTERLY LINE OF SAID LOT, SOUTH 5° 32' 13" WEST 123.40 FEET; THENCE SOUTH 85° 44' 35" WEST 121.27 FEET; THENCE NORTH 4° 15' 25" EAST 77.37 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE WEST AND HAVING A RADIUS OF 324.43 FEET; THENCE NORTHERLY ALONG SAID CURVE 67.69 FEET TO A POINT IN THE NORTHEASTERLY LINE OF SAID LOT, A RADIAL LINE OF SAID CURVE TO SAID POINT BEARS NORTH 83° 00' 31" EAST; THENCE ALONG SAID NORTHEASTERLY LINE, SOUTH 78° 11' 00" EAST 131.40 FEET TO THE POINT OF BEGINNING.

EXCEPT THAT PORTION OF SAID LOT CONVEYED TO THE CITY OF LOS ANGELES, BY DEED RECORDED ON FEBRUARY 10, 1926 AS INSTRUMENT NO. 1754, IN BOOK 5579, PAGE 217, OF OFFICIAL RECORDS OF SAID COUNTY.

**PARCEL 4:**

THOSE PORTIONS OF "C" AND "E" OF CIELO VISTA TERRACE, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS A WHOLE AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF SAID LOT "C" BEING ALSO THE MOST EASTERLY CORNER OF SAID LOT "E"; THENCE ALONG THE EASTERLY LINE OF SAID LOT "E", SOUTH 28° 00' 00" WEST 54.30 FEET TO THE MOST EASTERLY CORNER OF TRACT NO. 7325, AS PER MAP RECORDED IN BOOK 129, PAGE 84 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE ALONG THE NORTHEASTERLY LINE OF SAID TRACT NO. 7325, NORTH 49° 56' 10" WEST 117.60 FEET; THENCE NORTH 28° 00' 00" EAST 17.02 FEET; THENCE NORTH 5° 32' 20" EAST 58.43 FEET; THENCE NORTH 0° 26' 10" WEST 12.38 FEET; THENCE NORTH 89° 33' 50" EAST 119.12 FEET TO THE EASTERLY LINE OF SAID LOT "C"; THENCE SOUTHERLY ALONG THE EASTERLY LINE OF SAID LOT "C", A DISTANCE OF 118.15 FEET TO THE POINT OF BEGINNING.

EXCEPT THAT PORTION OF SAID LOTS CONVEYED TO THE CITY OF LOS ANGELES, BY DEED RECORDED ON FEBRUARY 10, 1926 AS INSTRUMENT NO. 1754, IN BOOK 5579, PAGE 217, OF OFFICIAL RECORDS OF SAID COUNTY.

**PARCEL 5:**

THAT PORTION OF LOT "C" OF CIELO VISTA TERRACE, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

*** LEGAL DESCRIPTION CONTINUED ***

04 0525307

3/5/04

25

ORDER NO. LA0430179

BEGINNING AT THE NORTHWEST CORNER OF THE LAND DESCRIBED AS PARCEL 2 IN DEED
TO MAHLON M. DELP, RECORDED IN BOOK 29605, PAGE 41 OF OFFICIAL RECORDS OF SAID
COUNTY; THENCE NORTH 0° 28' 10" WEST 23.82 FEET TO THE BEGINNING OF A CURVE
CONCAVE EAST AND HAVING A RADIUS OF 224.09 FEET; THENCE NORTHERLY ALONG SAID
CURVE 18.29 FEET; THENCE NORTHERLY IN A DIRECT LINE TO THE SOUTHWEST CORNER OF
LAND DESCRIBED AS PARCEL 1 IN THE ABOVE MENTIONED DEED TO MAHLON M. DELP;
THENCE ALONG THE SOUTHERLY LINE OF SAID PARCEL 1, SOUTH 85° 45' 30" EAST, A
DISTANCE OF 121.27 FEET TO THE SOUTHEAST CORNER OF SAID PARCEL 1; THENCE
SOUTHERLY IN A DIRECT LINE TO THE NORTHEAST CORNER OF THE LAND DESCRIBED AS
PARCEL 2 IN SAID DEED TO MAHLON M. DELP; THENCE SOUTH 89° 33' 50" WEST ALONG THE
NORTHERLY LINE OF SAID PARCEL 2, A DISTANCE OF 119.12 FEET TO THE POINT OF
BEGINNING.

EXCEPT THEREFROM THAT PORTION CONVEYED TO THE CITY OF LOS ANGELES, BY DEED
RECORDED IN BOOK 5579, PAGE 217, OF OFFICIAL RECORDS OF SAID COUNTY.

PARCEL 6:

THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 9, TOWNSHIP 1 SOUTH, RANGE 14
WEST SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES, COUNTY OF LOS
ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF THE SURVEY OF
SAID LAND ON FILE IN THE BUREAU OF LAND MANAGEMENT, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF LOT 9 IN BLOCK 51 OF TRACT NO. 2019, AS PER
MAP RECORDED IN BOOK 22, PAGES 126 AND 127 OF MAPS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY; THENCE NORTH 88° 43' 30" EAST ALONG THE EAST
PROLONGATION OF THE SOUTH LINE OF SAID LOT 9, A DISTANCE OF 10.04 FEET TO A POINT
IN THE WEST BOUNDARY OF LAUREL CANYON ROAD, 40 FEET WIDE; THENCE SOUTH 4° 01'
15" WEST ALONG SAID WEST BOUNDARY, A DISTANCE OF 20.79 FEET; THENCE SOUTHERLY
ALONG A CURVE CONCAVE TO THE EAST, TANGENT AT ITS POINT OF BEGINNING TO THE
LAST MENTIONED COURSE, AND HAVING A RADIUS OF 120 FEET, A DISTANCE OF 99.95 FEET;
THENCE SOUTH 43° 42' 15" EAST AND TANGENT TO SAID LAST MENTIONED CURVE AT ITS
POINT OF ENDING, A DISTANCE OF 214.35 FEET; THENCE CONTINUING SOUTHEASTERLY
ALONG SAID BOUNDARY, THE SAME BEING A CURVE CONCAVE TO THE SOUTHWEST,
TANGENT AT ITS POINT OF BEGINNING TO THE LAST MENTIONED COURSE, SAID HAVING A
RADIUS OF 280 FEET, A DISTANCE OF 65.76 FEET; THENCE NORTH 68° 07' 25" WEST, A
DISTANCE OF 35.30 FEET; THENCE SOUTHERLY ALONG A CURVE CONCAVE TO THE WEST,
TANGENT AT ITS POINT OF BEGINNING TO A LINE BEARING SOUTH 2° 10' 40" WEST, AND
HAVING A RADIUS OF 106 FEET, A DISTANCE OF 52.02 FEET; WHERE A TANGENCY TO SAID
CURVE BEARS SOUTH 30° 17' 45" WEST, THENCE SOUTH 89° 57' 30" EAST, A DISTANCE OF 65
FEET TO THE NORTHWEST CORNER OF THAT CERTAIN PARCEL OF LAND CONVEYED TO
FIDEL LA BARBA, BY DEED RECORDED IN BOOK 6070, PAGE 55 OF OFFICIAL RECORDS;
THENCE SOUTH 12° 51' 00" EAST ALONG THE WESTERLY LINE AND ITS PROLONGATION
SOUTHERLY OF SAID PARCEL, A DISTANCE OF 410.22 FEET; THENCE SOUTHEASTERLY
ALONG A CURVE CONCAVE TO THE NORTHEAST, TANGENT AT ITS POINT OF BEGINNING TO
THE LAST MENTIONED COURSE, AND HAVING A RADIUS OF 595 FEET, A DISTANCE OF 11.19
FEET, WHERE A TANGENCY TO SAID CURVE BEARS SOUTH 13° 55' 40" EAST; THENCE NORTH
76° 04' 20" EAST, A DISTANCE OF 75 FEET TO A POINT IN THE WEST LINE OF SAID LAUREL
CANYON ROAD; THENCE SOUTHEASTERLY ALONG THE WEST BOUNDARY OF LAUREL
CANYON ROAD, THE SAME BEING A CURVE CONCAVE TO THE EAST, TANGENT AT ITS POINT
OF BEGINNING TO A LINE BEARING SOUTH 13° 55' 40" EAST AND HAVING A RADIUS OF 520
FEET, A DISTANCE OF 35.90 FEET; THENCE ALONG THE WESTERLY BOUNDARY OF LAUREL
CANYON ROAD, AS DESCRIBED IN DEED RECORDED IN BOOK 5579, PAGE 217 OF

*** LEGAL DESCRIPTION CONTINUED ***

04 0525307

scription: Los Angeles,CA Document-Year.DocID 2004 525307

3/5/04

26

ORDER NO. LA0430179

OFFICIAL RECORDS OF SAID COUNTY, SOUTH 17° 53' 00" EAST AND TANGENT TO SAID LAST
MENTIONED CURVE, AT ITS POINT OF ENDING, A DISTANCE OF 153.80 FEET; THENCE
CONTINUING SOUTHERLY ALONG THE WESTERLY BOUNDARY OF LAUREL CANYON ROAD
AND HOLLYWOOD BOULEVARD, THE SAME BEING A CURVE CONCAVE TO THE WEST,
TANGENT AT ITS POINT OF BEGINNING TO THE LAST MENTIONED COURSE, AND HAVING A
RADIUS OF 439.43 FEET TO THE NORTHERLY LINE OF LOT "C" OF CIELO VISTA TERRACE,
SHEET NO. 2, AS PER MAP RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY; THENCE IN A GENERAL WESTERLY AND
NORTHWESTERLY DIRECTION ALONG THE NORTHERLY LINE OF CIELO VISTA TERRACE
SHEET NO. 2, FOLLOWING THE SAME IN ALL ITS VARIOUS COURSES AND DISTANCES TO THE
NORTHWESTERLY CORNER OF LOT "A", SAID CIELO VISTA TERRACE SHEET NO. 2, THENCE
NORTHERLY ALONG THE NORTHERLY PROOLONGATION OF THE WESTERLY LINE OF SAID
LOT "A" TO A POINT IN THE NORTH LINE 852.66 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM THAT PORTION OF SAID LAND DESCRIED IN THE DEED FROM FRED
RICHARD SALTER TO VIRGINIA LOUISE SALTER, RECORDED ON NOVEMBER 5, 1935, IN BOOK
13755, PAGE 259 OF OFFICIAL RECORDS OF SAID COUNTY.

PARCEL 7:

LOT "A" OF TRACT NO. 7326, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES,
STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 129, PAGE 84 OF MAPS, IN THE
OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 8:

AN EASEMENT FOR INGRESS AND EGRESS AND LANDSCAPING, WALLS, PLANTERS AND
IRRIGATION PURPOSES OVER THAT PORTION OF LOT "C", CIELO VISTA TERRACE, IN THE
CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP
RECORDED IN BOOK 53, PAGE 35 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF
SAID COUNTY, DESCRIBED AS FOLLOWS:

COMMENCING AT THE MOST NORTHERLY CORNER OF THAT PARCEL OF LAND DESCRIBED IN
DEED RECORDED IN BOOK 5649, PAGE 134, OFFICIAL RECORDS, THENCE SOUTHERLY ALONG
THE WESTERLY LINE OF SAID LAND, SAID WESTERLY LINE BEING A CURVE CONCAVE TO THE
NORTHWEST, HAVING A RADIUS OF 133.76 FEET, A DISTANCE OF 5.00 FEET; THENCE SOUTH
39° 55' 10" WEST A DISTANCE OF 21.00 FEET TO THE BEGINNING OF A TANGENT CURVE
CONCAVE TO THE SOUTHEAST HAVING A RADIUS OF 55.00 FEET; THENCE SOUTHERLY
ALONG SAID CURVE, A DISTANCE OF 5.93 FEET THROUGH A CENTRAL ANGLE OF 6° 10' 29" TO
THE TRUE POINT OF BEGINNING; THENCE CONTINUING SOUTHERLY ALONG SAID CURVE A
DISTANCE OF 3.53 FEET THROUGH A CENTRAL ANGLE OF 3° 40' 48" TO THE BEGINNING OF A
CURVE CONCAVE TO THE SOUTHWEST HAVING A RADIUS OF 90.23 FEET, A RADIAL LINE -
HAVING A BEARING OF NORTH 76° 37' 01" WEST; THENCE NORTHERLY ALONG SAID CURVE A
DISTANCE OF 3.00 FEET THROUGH A CENTRAL ANGLE OF 1° 54' 15"; THENCE NORTH 86° 48'
07" EAST 1.22 FEET TO THE TRUE POINT OF BEGINNING.

04 0525307

3/5/04

*27*

# FIXED/ADJUSTABLE RATE RIDER
## INTEREST ONLY FIXED PERIOD
(LIBOR 6 Month Index (As Published In *The Wall Street Journal*)- Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this   19TH day of FEBRUARY   , 2004 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to
FIRST CAPITAL, A CALIFORNIA CORPORATION

("Lender") of the same date and covering the property described in the Security Instrument and located at
8159 HOLLYWOOD BOULEVARD
LOS ANGELES, CALIFORNIA 90069

(Property Address)

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of       5 750      % The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:
**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    **(A) Change Dates**
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of
MARCH      ,  2009      , and the adjustable interest rate I will pay may change on that day every   6 TH   month thereafter The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date "

LOAN NO   3439730                                   Initials
MULTISTATE FIXED/ADJUSTABLE RATE RIDER- LIBORIO - Single Family
8488396   (0208)                      Page 1 of 4                              Form 5008
                             VMP MORTGAGE FORMS - (800)521-7291                 8/2002
*DOCPREP SERVICES INC*  FORM - TRFIX008-03D        ORIGINAL

# 04  0525307

3/5/04

28

**(B) The Index**
Beginning with the first Change Date, my adjustable interest rate will be based on an Index The "Index" is the average of interbank offered rates for six-month U S dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal* The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index "

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information The Note Holder will give me notice of this choice

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding
THREE AND 000/1000                                                percentage points
(          3.000          %) to the Current Index The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0 125%) Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments The result of this calculation will be the new amount of my monthly payment

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than
       10 750       % or less than             3 000          % Thereafter, my adjustable interest
rate will never be increased or decreased on any single Change Date by more than   ONE (1 00) percentage points from the rate of interest I have been paying for the preceding   SIX (6) months My interest rate will
never be greater than             11 750         %

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice

**(G) Date of First Principal and Interest Payment**
The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment due after the first Change Date

LOAN NO .   3439730                              Initials

6480596  (0208)
*Docprep Services Inc*  FORM - 1MY13000-4343

Page 2 of 4
**ORIGINAL**

Form 5003
8/2002

04 0525307

scription: Los Angeles,CA Document-Year.DocID 2004.525307 Page: 28 of 31

3/5/04

29

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1   Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law

If Lender exercises this option, Lender shall give Borrower notice of acceleration The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower

2   When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law  Lender also shall not exercise this option if (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption  Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing

Initials

LOAN NO.   3439730                                                          Form 5008
8480396  (0206)                          Page 3 of 4                        8/2002
DOCPREP SERVICES INC  FORM - IN-DYS005-4343   ORIGINAL

## 04  0525307

Description: Los Angeles,CA Document-Year.DocID 2004.525307 Page: 29 of 31

3/5/04

*30*

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider

_____ (Seal)        _____ (Seal)
                          -Borrower                                -Borrower
DANIEL S LAIKIN

_____ (Seal)        _____ (Seal)
                          -Borrower                                -Borrower

_____ (Seal)        _____ (Seal)
                          -Borrower                                -Borrower

_____ (Seal)        _____ (Seal)
                          -Borrower                                -Borrower

Form 6008
8/2002

LOAN NO.  3439730

8480396  (0208)                    Page 4 of 4
DocPrep Services Inc  FORM DXFY5008-4343    ORIGINAL

04 0525307

Description: Los Angeles,CA Document-Year.DocID 2004.525307 Page: 30 of 31

31

# ILLEGIBLE NOTARY SEAL DECLARATION

## GOVERNMENT CODE 27361.7

I certify under penalty of perjury that the notary seal on the document to which this statement is attached reads as follows

Name of Notary      _Xochitl Barron_

Date Commission Expires    _Mar 15, 2006_

Notary Identification Number    _1346617_
(For Notaries commissioned after 1/01/1992)

Manufacturer/Vendor Identification Number    _NNA1_
(For Notaries commissioned after 1/01/1992)

Place of Execution of this Declaration    _Norwalk_

Date    _3 / 5 / 04_

_____
Signature (Firm name if any)

04 0525307